# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2180

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FELIX VASQUEZ-RUIZ,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 1044—**Matthew F. Kennelly**, *Judge.*

———————

ARGUED JANUARY 12, 2007—DECIDED SEPTEMBER 17, 2007

———————

Before POSNER, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.*  Felix Vasquez-Ruiz ostensibly practiced medicine in the Chicago area. In reality, he was bilking insurance companies by ordering a multitude of unnecessary tests for patients who visited his clinic. Eventually he was caught and tried on multiple counts of mail and healthcare fraud. Nine days into his trial, however, the proceedings took an unexpected and unsettling turn when a juror complained to the district judge that the word "GUILTY" had mysteriously appeared written in the notebook she had been using during the trial. The anonymous message, she reported, intimidated her. The district court immediately interviewed the juror to make sure that she could remain impartial; it then

issued a cautionary instruction to the rest of the jury. Later, it denied Vasquez-Ruiz's motion for a mistrial.

On February 25, 2002, the jury found Vasquez-Ruiz guilty on all counts of the indictment; he was sentenced on September 11, 2002, to a term of 168 months' imprisonment, and the court entered judgment on October 21, 2002. At that point, Vasquez-Ruiz's attorney neglected to file a direct appeal. On February 18, 2005, the district court, in response to a motion under 28 U.S.C. § 2255, ruled that the lawyer had rendered ineffective assistance. After a few more procedural adjustments, the court entered a fresh judgment, from which Vasquez-Ruiz took a timely appeal. Before this court, Vasquez-Ruiz challenges both the judge's refusal to grant a mistrial and a number of factual findings made by the district judge at sentencing. We conclude that this incident gave rise to a presumption of prejudice to the defendant, and that the evidence was insufficient to rebut that presumption. Under these circumstances, it was error for the court to refuse to declare a mistrial. We reverse Vasquez-Ruiz's conviction and remand for the new trial that he requested.

**I**

Vasquez-Ruiz began practicing medicine as a general practitioner in Illinois in 1987. He is a native of Panama and attended medical school in Brazil; because of his ethnic background and fluency in Spanish, the majority of his patients are Hispanic. In 1996, Vasquez-Ruiz began serving patients at a clinic that was then called Medicorp. (Medicorp later changed its name to Strategic Group Limited, but we can safely ignore that fact.) Among other services, the clinic offered free health screenings, including free cholesterol and diabetes tests, at local grocery stores in and around Chicago. Often patients were approached in the stores and offered the free services;

some were contacted over the telephone and encouraged to have testing done. Patients who participated in the screenings could receive their results at the clinic. Medicorp facilitated clinic visits by offering free transportation.

When patients came in to the clinic for their test results or an examination, they began by filling out questionnaires regarding their medical histories. Vasquez-Ruiz would then conduct his own interview with the patient, focusing on what he called "the most common diseases or disorders in Hispanic patients" such as diabetes, hypertension, hepatitis, and heart problems. After completing the interviews, Vasquez-Ruiz would examine the patients for ailments such as lower back pain, gallstones, urinary tract infections, allergies, and nerve problems. Frequently, he would recommend that a patient undergo tests including nerve conduction velocity ("NCV") and somatosensory evoked potential ("SSEP") tests, which are used primarily to evaluate symptoms of nerve degeneration such as numbness, tingling, burning or weakness in the arms and legs. As was proven at trial, and as Vasquez-Ruiz later admitted in an interview with a special agent from the Department of Labor, Lynn Mares O'Dea, Vasquez-Ruiz prescribed these tests for a remarkably high number of patients knowing that they were medically unnecessary. He lied to patients, telling them that the tests were necessary, and he caused false entries to be made in their medical records, with false descriptions of complaints and symptoms like numbness or pain in the extremities to make the tests seem justified. Vasquez-Ruiz also submitted fraudulent bills to insurers, seeking reimbursement for the medically unnecessary tests. Some of the patients were completely healthy and the tests were nothing worse than superfluous, but fairly innocuous, annoyances. Others actually had serious medical problems entirely unrelated to any nerve issues (like

gallstones), which went untreated because Vasquez-Ruiz convinced them that they just needed a nerve test.

Vasquez-Ruiz was ultimately charged with seven counts of mail fraud, in violation of 18 U.S.C. § 1341, and twenty counts of healthcare fraud, in violation of 18 U.S.C. § 1347. A jury trial began on February 13, 2002. Nine days later, after the close of evidence, one of the jurors—Elva Diaz, the only Hispanic member of the jury—informed the district judge that someone other than herself had written the word "GUILTY" in capital letters in the notebook in which she had been taking notes throughout the trial. Diaz claimed that the mysterious notation made her feel threatened.

The district judge immediately brought the issue to the parties' attention and identified two concerns raised by the existence of the note: that Juror Diaz herself may have been influenced by the mysterious writer, and that someone else, perhaps another juror, may have prejudged the case and was potentially trying to sway others on the jury. The district court and the parties attempted to identify the author of the note. The court noted that the notebooks had been left in the jury room overnight and that the only person with access to that room was the cleaning person, who was unlikely to have written in the notebook. At that point, the judge stated that it was his "governing assumption" that another juror had written the note. The court first questioned Diaz about the note. She stated that she noticed it for the first time the previous day while taking notes during the defendant's testimony. She said that she had no idea who wrote the note and had not spoken with any other members of the jury about it. Asked whether she had been keeping her notebook in the jury room overnight, she replied, "Well, sometimes—overnight, over here in that room." The district court asked Diaz whether she would be able to put the event out of her mind and decide the case based

on the law and the evidence without feeling threatened. Diaz answered, "It's going to be hard, but yeah, I think I can do it." Given the opportunity by the district judge, neither side wanted Diaz excused from the jury.

The district judge investigated the possibility that the notation was left over from the notebook's use in a previous trial. Prior to this case, the court would reuse notebooks by tearing used pages out after each trial. Diaz's notebook was new, however, and the notation appeared somewhere in the middle, making it unlikely that a prior user had written the word, except for the remote possibility that a prior juror had simply written nothing but his or her verdict in the middle of the notebook. That possibility was made even less realistic by the fact that the word "GUILTY" appeared on the very next page after the one on which Diaz had finished writing the day before she noticed it. The district court then tried to compare the handwriting of the word "guilty" with that of the jurors' questionnaires, but it failed to detect anything conclusive. At that point, Vasquez-Ruiz moved for a mistrial.

The court denied the motion on two grounds. First, the judge stated that "it's not at all clear that this was done by another juror." Second, the court believed that a curative instruction to the entire jury would be sufficient. Accordingly, the judge instructed the jury as follows:

> Ladies and gentlemen, I need to discuss something with you . . . that it's come to my attention that something turned up in one of the juror's notebooks that it's conceivable might have been written in there by another juror in the case, and if so, that might suggest that somebody might have potentially made up their mind about the result of the case already. I don't know if that's the case, but that's—as I said, those are the possibilities.

I want to repeat something that I said to you the first ten minutes you came in here and that I then again repeated to you at the beginning of the trial, and I really want to do this in the strongest possible terms. It is vitally important, and; that is, that the defendant in this case is presumed to be innocent of the charges, and he is every bit as presumed innocent right now as he was at the beginning of the case. In fact, the instruction that I will give you once the arguments are over will say that the presumption continues not just throughout the trial but during your deliberations and that it cannot be overcome unless you find unanimously that the government has proved beyond a reasonable doubt that the defendant is guilty. And I need to tell you that if there is anyone on the jury, including the alternates, that has even the slightest hesitation of your ability to follow that instruction, you have not just frankly a moral obligation but you have a legal obligation to tell me that. And even if you don't tell me that right now, you have an obligation to tell me that, you know, by some sort of a note at the next break in the case. So does everybody understand what I'm saying to you?

After deliberations had begun, the district court reminded the jurors:

[I]t's important that your deliberations and your decisions all occur within the context of all 12 of you being in the jury room discussing the case. If anyone attempts to contact you or if anyone in the past has given you any notes, attempted to contact you or anything at all, it's important that you give a note to the officer so that I have that and I am aware of it.

On February 25, 2002, Vasquez-Ruiz was convicted of all charges. He appeals the district court's denial of his motion for a mistrial. Additionally, he challenges a number of factual findings made at sentencing.

**II**

Vasquez-Ruiz's primary argument on appeal is that the district court mishandled the situation involving Juror Diaz and should have granted his motion for a mistrial on the ground of the apparent presence of juror bias. He challenges the district judge's decision not to conduct *voir dire* of each juror to ferret out the person who wrote "GUILTY" in Diaz's notebook. The district court, he claims, abused its discretion when (as Vasquez-Ruiz sees it) it concluded that it lacked the authority to conduct individualized *voir dire.* Vasquez-Ruiz also argues that even if the district court was aware of its ability to conduct individualized *voir dire*, it erred by deciding not to do so.

The government responds first that Vasquez-Ruiz forfeited this issue because he did not ask the district judge to question each juror individually; this court's review, the government insists, can be only for plain error. But this argument assumes that it was Vasquez-Ruiz's burden to ask for the individualized *voir dire*. In our view, all that Vasquez-Ruiz had to do was move for a mistrial (which he did); it was the government's burden to try to show that the apparent interference with Juror Diaz's autonomy was harmless. The proper standard of review is thus the familiar abuse of discretion standard, which is the one we use to review an order denying a motion for mistrial based on juror bias. See *United States v. McClinton*, 135 F.3d 1178, 1186 (7th Cir. 1998). We have previously recognized that "[t]he management of juries traditionally lies within the sound discretion of the trial judge." *United States v. Wiesner*, 789 F.2d 1264, 1269 (7th Cir. 1986); see also *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000). A mistake of law is automatically an abuse of discretion. See *United States v. Jaderany,* 221 F.3d 989, 994 (7th Cir. 2000).

There are a number of aspects of this record that give us grave concern. First is the content of the note. Nothing could be more central to the jury's function than an opinion on ultimate guilt or innocence. This note is therefore nothing like the excerpt from the American Judicature Society that one juror read to her fellows in *United States v. Warner*, 2007 WL 2363220 (7th Cir. Aug. 21, 2007). That article emphasized the "sanctity of the deliberative process" in the most general terms. *Id.* at *6. This note, in contrast, looked like a direction to Juror Diaz about how she should vote in Vasquez-Ruiz's case. Second is the district court's assumption that the note could have been written only by another juror or a member of the courthouse cleaning staff. True, those are two logical possibilities, but the third is that another person might have obtained access to Diaz's notebook and tried to interfere with the jury's deliberations. This possibility went largely unexplored before the district court, probably because everyone assumed that the security measures that had been taken with the notebooks (in particular, locking them in the jury room at night) had successfully insulated them from outside contact. But Juror Diaz herself was not able to say unequivocally that she had never taken the notebook out of the courthouse. Moreover, the court's investigation indicated that the handwriting did not appear to match that of any of the jurors. Even if it was unlikely that the court cleaning staff would have made such a notation, one cannot say that this was an impossibility.

What we are left with is the district court's implicit finding of fact that Juror Diaz herself was not the person who wrote "GUILTY" in the notebook. Logically, therefore, it was another person, either from the jury or from outside. If the note was written by an outsider, then we must analyze what happened using the line of cases that govern external influences on a jury. The Supreme Court

has held that such influence is presumptively prejudicial. See *Remmer v. United States*, 347 U.S. 227 (1954); see also *Warner*, *supra*. That presumption can be rebutted by the government (and we found that it had been in *Warner*, see 2007 WL 2363220 at \*11), but there must be some basis in the record to find rebuttal. The record here is, in our view, inconclusive.

First, the district court decided that it was too risky to question the other jurors about the incident, saying:

> I'm really not—I think it would be—I think it would be a mistake to question people. I don't think I can do that. I don't think I can start questioning jurors in the middle of a trial.

Although we do not interpret this statement as an indication that the judge erroneously thought that he lacked authority to question individual jurors, it certainly shows that he thought that questioning was a bad idea in this case. But this left a void in the record. Under *Remmer*, the burden is on the government to rebut the presumption of prejudice from an external influence on the jury. 327 U.S. at 229. We see no way that the government can satisfy that burden without developing all the information.

District court judges have broad discretion to choose how to handle different problems that arise with juries. We will reverse only if they stray beyond these generous boundaries. But, as we have noted from time to time, "deference" does not mean "total acquiescence." The court recognized that the note raises two general concerns. The first is that Diaz may have been intimidated or somehow influenced improperly by its appearance in her notebook. The second set of issues relates to the content of the note. Vasquez-Ruiz argues that the note evinces racial bias, since the only juror to find such a note was also the only Hispanic on the jury. He suggests that the writer "may have been motivated by the assumption that [Diaz]

was likely to find in favor of Vasquez-Ruiz due to their shared ethnic background." Once again, although this may be speculation, the real question is the legal one of who bears the risk of uncertainty in this situation—the prosecution or the defendant? On the assumption that someone external to the jury wrote this word, we read *Remmer* as holding that it is the prosecution.

The only remaining question is whether the same analysis should apply if the author of the note was really another juror who had prematurely concluded that Vasquez-Ruiz is guilty. (We stress again that this is just a guess, even if it may seem like the more likely possibility.) Vasquez-Ruiz urges that the district judge should have conducted *voir dire* with each member of the jury in an effort to determine the note's origin and purpose, and that his failure to do so is reversible error. He relies heavily on *McClinton* for the proposition that "the District Court's failure to conduct individual *voir dire* . . . constituted an abuse of discretion." In *McClinton*, two jurors were overheard by others on the jury making potentially racist comments. The comments also appeared to indicate that at least one of the jurors had prejudged the guilt of the defendants, who were African-American. One of the defendants moved for a mistrial. The district judge dealt with the situation by questioning each of the jurors individually. She asked "whether they had any personal knowledge of the conversation, heard any other statements of this sort, shared any of these beliefs about African-Americans, or had any bias or prejudice toward African-Americans." *McClinton*, 135 F.3d at 1185. The court additionally inquired whether "the statements influenced the jurors in any way; whether they could keep an open mind about the defendants' guilt or innocence; and whether they could not be impartial for any reason." *Id.* In the process, the judge was able to determine which jurors had made the inappropriate comments and

what the comments meant. She then excused one of the jurors and admonished the rest "about the importance of keeping an open mind," *id.*, but denied the defendant's motion for a mistrial.

On appeal, this court considered whether the district court abused its discretion by not declaring an immediate mistrial. In affirming the lower court's decision, we held that the district judge's handling of the situation and specifically the decision to question individual jurors was "a reasonable response to a difficult situation . . . [and] therefore was not an abuse of her discretion." *Id.* at 1188. The broader point here is that the district court's actions resulted in the development of a record that enabled both that court and this one to evaluate the degree of prejudice that had developed, and to come to a reasoned conclusion on the question whether the curative steps were adequate. We are not saying, in this connection, that there is an ironclad requirement that individualized *voir dire* is always necessary. To the contrary, we have recognized in the past that

> [n]ot every allegation of jury misconduct is sufficiently substantial or sufficiently well substantiated to warrant putting the jurors on the spot in this fashion. . . . Quizzing a juror, or perhaps all the jurors, in the middle of a trial is likely to unsettle the jury, and the judge is not required to do so unless there is a much stronger indication of bias or irregularity than there was here.

*United States v. Stafford*, 136 F.3d 1109, 1112-13 (7th Cir. 1998). Some allegations of misconduct might not warrant individualized *voir dire* and others will; other information may already be in the record that makes this kind of inquiry unnecessary. Here, where a mysterious note simply appears in a juror's notebook, and where we cannot even say with assurance that it was another juror who

wrote the note in the first place, there was a need to make a greater effort to find out what had happened before declaring that it did not make any difference. Such an investigation would not necessarily involve questioning the other jurors (an option the district judge rightly thought held its own risks), but as a last resort such a step may be unavoidable.

It is true that the district court tried to address the situation by giving a curative instruction. We have previously found a curative instruction to be sufficient in an instance of serious jury misconduct. In *United States v. Read*, 658 F.2d 1225 (7th Cir. 1981), the trial judge received a note from a juror before the jury had begun its third day of deliberations:

> According to the letter, most of the jurors made up their minds by the second week of trial (the trial lasted at least seven weeks); many completely disregarded the judge's instructions that the jurors not look in the newspaper financial sections and made a point of examining Cenco stock [in a securities fraud case]; many of these jurors refused to deliberate or discuss the case, claiming "all these guys are guilty," and instead worked on crossword puzzles, and several of the jurors thought the whole trial was hilarious and laughed at the attorneys.

658 F.2d at 1241. The court denied the defendant's motion for a mistrial. Instead, it chose simply to read a cautionary instruction to the entire jury and interviewed the juror who sent the note after the jury had returned a verdict against the defendant. *Id.* On appeal, this court noted that the trial judge was "in the best position to sense the atmosphere of the courtroom as no appellate court can on a printed record." *Id.* (internal quotations omitted). We concluded that the district judge "properly exercised his discretion in responding to the allegations," and affirmed the denial of the motion for mistrial. *Id.* at 1241-42.

Vasquez-Ruiz argues that his case is more like *United States v. Resko*, 3 F.3d 684 (3d Cir. 1993), than it is like *Read*. In *Resko*, seven days into a nine-day trial the judge learned that jurors had been discussing the case among themselves. 3 F.3d at 686. The defendants asked the court to conduct individualized *voir dire* to determine the nature of the conversations that took place and the extent of any possible prejudice to the defendant caused by the premature deliberations. *Id.* at 687. They also moved for a mistrial. In lieu of individualized *voir dire*, the court had each juror fill out a questionnaire, which asked whether he or she had discussed the case. Every juror answered in the affirmative, although nobody claimed to have reached a conclusion on guilt or innocence. Concluding that the defendants suffered no prejudice, the court denied the motion for mistrial.

The Third Circuit reversed on appeal. Although the court recognized "a clear doctrinal distinction between evidence of improper *intra*-jury communications and *extra*-jury influences" and that "[i]t is well-established that the latter pose a far more serious threat to the defendant's right to be tried by an impartial jury," *id.* at 690, it concluded that simply handing out the questionnaire without any follow-up "was inadequate to enable the court to fulfill its responsibility of providing an appropriate cautionary instruction and of determining whether prejudice resulted from the jury misconduct." *Id.* at 691.

We come back, in the end, to the lack of information in this record about the source of the notation in Juror Diaz's notebook. The record is too sparse to permit us to conclude that the government rebutted the presumption of prejudice that arises under *Remmer*, on the assumption that the writer was someone not on the jury. Even if the writer was another juror, we agree with Vasquez-Ruiz that this case is more like *Resko* than like *Read*. If someone

on the jury was trying to pressure Juror Diaz into voting to convict Vasquez-Ruiz, before deliberations began and before the court instructed the jury, then the court might have taken different remedial measures. Perhaps it would have dismissed the miscreant juror; perhaps it would have issued a different cautionary instruction; perhaps it would have declared a mistrial. As it was, however, we conclude that the unexplained apparent attempt by someone to tell Juror Diaz to vote "GUILTY" could be cured only by granting a mistrial.

## III

Vasquez-Ruiz also challenged several findings that the district court made in connection with his sentencing: the amount of loss attributable to him (U.S. SENTENCING GUIDELINES MANUAL § 2F1.1 (1998)); the finding that his fraud involved "the conscious or reckless risk of serious bodily injury" (*id.* § 2F1.1(b)(6)(A)); the two-point enhancement for committing an offense "through mass-marketing" (*id.* § 2F1.1(b)(3)); and the application of the two-point "vulnerable victim" enhancement (*id.* § 3A1.1(b)(1)). Because we are remanding for a new trial, we need not reach these points. We note only that at the time Vasquez-Ruiz was sentenced, the Supreme Court had not yet decided *United States v. Booker*, 543 U.S. 200 (2005), and so the district court treated the Sentencing Guidelines as mandatory. Should Vasquez-Ruiz be convicted again, the district court will naturally treat the Guidelines as advisory only.

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

No. 06-2180    15

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*