In the

# United States Court of Appeals

### For the Seventh Circuit

————————

No. 06-3607

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAVIER REYES,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 970—**Harry D. Leinenweber**, *Judge.*

————————

ARGUED JUNE 4, 2008—DECIDED SEPTEMBER 5, 2008

————————

Before BAUER, WOOD and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury convicted Javier Reyes of conspiracy to commit bank robbery, bank robbery, and possessing and brandishing a handgun in furtherance of violence. The district court sentenced Reyes to 300 months' imprisonment. On appeal, Reyes argues that the district court erred in allowing evidence of his prior bad acts, limiting the scope of cross-examination of a co-defendant witness, and denying his motion for new trial. For the following reasons, we affirm.

## I. BACKGROUND

In the early morning of August 23, 2004, Antonio Vasquez, Ramon Berrios, Walter DeJesus, and Jose Torres robbed the WECO Credit Union in West Chicago, Illinois. Around 7:00 a.m., DeJesus entered the Credit Union while the others kept watch outside in two separate cars. DeJesus, brandishing a gun, led Ron Schuermann, the only employee on duty at that time, to the rear of the building. Vasquez then entered the Credit Union, emptied money from an open safe, opened a second safe with keys found in the first safe, and demanded that Schuermann divulge the combination to a third safe. Schuermann obliged. After packing up the money from the third safe, the two men returned to the cars and drove off.

During the robbery, Reyes was many miles away, enjoying a vacation in the Wisconsin Dells. But he had his own connection to the Credit Union. Earlier in the year, Reyes had worked there as a loan officer, but had been fired after three months on the job. While in the process of getting fired, Reyes overheard that the Credit Union's security cameras did not work.

According to Vasquez, DeJesus, and Torres—all of whom would later testify for the government against Reyes pursuant to a cooperation agreement—in mid-August, 2004, Reyes had a series of conversations with each of them in which they discussed robbing the Credit Union. Eventually, Reyes provided DeJesus and Vasquez with information that: (1) the security cameras at the Credit Union did not work; (2) Schuermann, the President of the

Credit Union, would be working alone between 7:00 and 8:00 a.m.; (3) the Credit Union had three safes, the first of which would have the keys to the second, and the third of which would require the combination kept by Schuermann. In addition, Reyes drew a map of the floorplan of the Credit Union, showing the locations of the safes, the panic switches for the alarms, and the entrances and exits to the building. Reyes, according to his co-conspirators, gave further instructions on what to do with the proceeds of the robbery and told of his intention to create an alibi by heading to Wisconsin. After the robbery, Reyes made several demands regarding his share of the profits.

On January 11, 2005, a grand jury indictment charged Reyes with conspiracy to commit bank robbery in violation of 18 U.S.C. § 371 (Count I); bank robbery in violation of 18 U.S.C. § 2113(a) (Count II); and possessing and brandishing a handgun in furtherance of violence in violation of 18 U.S.C. § 924(c)(1)(A) (Count III). Reyes's defense relied on attacking the testimony of the co-defendants as inconsistent and biased. He also argued that, if he had disclosed information to his co-defendants, he did so innocently and without any intent to commit a crime. On October 19, 2005, the jury found Reyes guilty of all charges. Reyes filed a motion for a new trial on November 9, 2005 and another motion for a new trial claiming newly discovered evidence on April 26, 2006.

On August 31, 2006, the district court denied both motions. That same day, the court sentenced Reyes to 60 months' imprisonment on Count I and 216 months'

imprisonment on Count II, to be served concurrently. The court also sentenced Reyes to 84 months' imprisonment for Count III, to be served consecutively to the sentences for Counts I and II. The court also imposed a three-year term of supervised release, a special assessment of $300, and restitution in the amount of $107,803.36. This timely appeal followed.

## II. DISCUSSION

On appeal, Reyes argues that the district court: (1) abused its discretion in granting the government's motion to allow evidence of Reyes's alleged prior criminal behavior; (2) denied Reyes a fair trial by narrowing the scope of his cross-examination of Torres; and (3) abused its discretion in denying his motion for a new trial based on newly discovered evidence. We will address each issue in turn.

### A.  Introduction of Rule 404(b) Evidence

Prior to trial, the government filed a motion asking the district court to allow the introduction of evidence of prior bad acts of Reyes under Federal Rule of Evidence 404(b). The evidence involved Reyes's participation in a series of previous robberies and a bank fraud scheme with two of his co-conspirators.

At Reyes's trial, DeJesus testified that he had participated in "[a]bout two" other robberies with Reyes. He testified that the two had participated in the robbery of a

bowling alley "[a]round 2003" and the robbery of a house in "[e]arly 2003 or late 2002." DeJesus gave no other details about either robbery.

Torres testified that he and Reyes "had done another robbery before" but were never caught. According to Torres, the robbery occurred "in 2003 in Hinsdale—or Hinkley." Torres further testified that Reyes had attempted to involve him in a scheme whereby Torres would pose as a Credit Union customer and withdraw money from that customer's account. However, Torres chose not to participate in the crime, offering an oddly generous reason for his decision: "It wasn't a fair split. He was talking about like $5,000. I would get $4,500 and he would get $500."

The government argued that the evidence was necessary to show "the nature and strength of the relationship between [the] co-conspirators" and "to show [Mr. Reyes's] intent in providing information to them." The court stated:

> Well, it is propensity evidence, but it also would rebut the fact that the defendant innocently disclosed certain information which made the bank robbery feasible or possible. If that's your defense, then I'm going to grant their motion and allow them to introduce that. If that's not your defense, then I would be inclined to believe that the prejudice certainly exceeds—that the propensity, it's certainly more proof of propensity. But I think that they're entitled to know that they had previous relationships, you know, that make it more likely, makes it certainly more likely true that he didn't believe that he was innocently disclosing information. So it all depends on what your defense is.

The court ultimately ruled that it would allow the prior acts because it was relevant as to whether Reyes unwittingly provided the information to the co-defendants.

We review a district court's decision to allow Rule 404(b) evidence for an abuse of discretion. *United States v. Moore,* 531 F.3d 496, 499 (7th Cir. 2008). Four conditions must be met to allow the introduction of evidence under 404(b):

   (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged;

   (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue;

   (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and

   (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Id.* (citing *United States v. Ross*, 510 F.3d 702, 713 (7th Cir. 2007)).

Reyes contends that the government failed to meet all four of these requirements, but we only need to focus on the third; the Rule 404(b) evidence introduced falls short of meeting it. We have held that the "preponderance" standard is appropriate for determining the admissibility of prior acts evidence. *United States v. Burke*, 425 F.3d 400, 410 (7th Cir. 2005) (citing *Huddleston v. United States*, 485 U.S. 681, 690, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)). Even

by this standard, the evidence of the prior robberies lacks the requisite factual support; the support that Torres and DeJesus do provide is inconsistent and contradictory. Torres could not identify in which of two Chicago suburbs his robbery took place and could only put the time of the robbery within a year. DeJesus could not even identify the year when either of his two robberies took place; as for the location, the only affirmative details he gave were that one occurred in a house and another in a bowling alley. There was no corroborating evidence to support these allegations of the witnesses.

The government argues that even if the evidence of these acts was slight, the robberies were introduced for a limited purpose, and the district court issued a limiting instruction. While this may be true, it does not relieve the government of its obligation to meet the requirement that the evidence be "sufficient to support a jury finding."

However, this error was harmless beyond a reasonable doubt. "Error in admitting Rule 404(b) evidence may be deemed harmless if we are convinced that the error did not influence the jury, or had but very slight effect, and can say with fair assurance . . . that the judgment was not substantially swayed by the error." *United States v. Dennis*, 497 F.3d 765, 769-70 (7th Cir. 2007) (internal quotations and citation omitted). The government presented enough evidence at trial to satisfy any concern that the error swayed the jury. The testimony of the co-conspirators showed that Reyes played a key role in organizing and plotting the Credit Union heist. Reyes gave specific and extensive details about the inner workings of the Credit

Union, including the strengths and weaknesses of the security system. He pinpointed the location of the safes and how to access them, and recommended the ideal time to commit the robbery. Moreover, the government did not discuss the prior acts in summation or rebuttal, and the district court gave a limiting instruction on the use of the evidence. In light of the limited use of this evidence and substantial evidence of guilt presented at trial, we are satisfied that the error did not improperly influence the jury.

**B. Limiting Cross-Examination**

Reyes next argues that he was denied a fair trial by the cutting off of his cross-examination of co-defendant Torres. Under the Confrontation Clause of the Sixth Amendment, a defendant must be given an opportunity for effective cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *United States v. Smith*, 454 F.3d 707, 714 (7th Cir. 2006). We review a district court's decision to limit the extent of cross-examination for abuse of discretion. *United States v. Khan*, 508 F.3d 413, 417 (7th Cir. 2007). However, where the limits affect a criminal defendant's right to confront a witness who testifies against him, we review the limitation *de novo*. *Id.* at 417-18. "[W]hen deciding whether limits on cross-examination are permissible, we must first distinguish between the core values of the Confrontation Clause and more peripheral concerns which remain within the trial court's ambit." *Smith*, 454 F.3d at 714. If the "core values" of the Confrontation Clause remain intact, we

merely ensure that the district court's exercise of its wide discretion in limiting cross-examination was not abusive. *Khan*, 508 F.3d at 418.

During the trial, the government introduced evidence that Reyes had several pre-robbery conversations with his co-defendants regarding the inner workings of the Credit Union. The foundation of these conversations came from the testimony of DeJesus, Vasquez, Torres, and Berrios. During the direct examination of Torres, the government elicited testimony that Torres attended three pre-robbery meetings: one at Torres's house with Berrios, Vasquez, and Reyes; one with Vasquez, DeJesus, and Reyes; and a final meeting with Reyes alone. On cross-examination, counsel for Reyes attempted to ask about a meeting on August 22, 2004 between Torres and Dayana Rodriguez, the individual who supplied one of the get-away vehicles:

> [Counsel for Reyes]: Mr. Torres, when you were planning—when the robbery was getting planned, you claim that—well, you said that one thing you had to do—I don't know if you talked about this on direct, but one thing you did have to do was find a getaway vehicle. That's something that had to happen, right?
>
> [Torres]: Yes.
>
> Q: And to do that, you had a meeting with Dayana Rodriguez, correct?
>
> A: Correct.
>
> Q: And that meeting took place on Sunday, August 22nd, correct?

At this point, the government objected to the testimony as beyond the scope of the direct examination. The district court sustained the objection. The cross-examination continued:

> Q: Mr. Torres, during the course of this, you said that Mr. Reyes was involved in all the aspects of planning the robbery, correct?
>
> A: Yes.
>
> Q: But it's your understanding, Mr. Torres, that Mr. Reyes, he never was involved in getting the getaway car. That's the one thing he didn't have anything to do with, right?
>
> A: That's the only thing.
>
> Q: Right. So as far as you know, he never discussed the car with Dayana Rodriguez, correct?
>
> . . .
>
> A: As far as I know, no.
>
> Q: Then they never had a discussion at your house on Sunday, the 22nd, did they?
>
> . . .
>
> A: No.
>
> Q: Mr. Torres, on the night of the 22nd—well, the 22nd, that was after Mr. Reyes was already gone on vacation. That's true, isn't it?
>
> A: Yes.
>
> Q: On the night of the 22nd, you sat down with Berrios and Vasquez and DeJesus, correct?

A: Yes.

Q: And you guys had a meeting where you discussed your final plans, right?

[Counsel for the government]: Objection, Your Honor. This is all beyond the scope.

[Counsel for Reyes]: Your Honor, they talked about all the planning that Mr. Reyes did. It's only fair that we discuss whatever planning Mr. Reyes didn't do so that the jury can make that contrast.

The district court then sustained the government's objection.

We find that the district court did not limit the cross-examination so as to affect the "core values" of the Confrontation Clause. In excluding the examination of the meeting between Torres, Berrios, Vasquez, and DeJesus, Reyes was not entirely precluded from delving into the discussion. Moreover, Reyes could have called Torres during his case in chief and elicited testimony on the specifics of that meeting. He chose not to do so. If that would have created difficulties, Reyes should have raised such concerns at that time so that the district court could have weighed the difficulties against allowing the outside-the-scope testimony. To the extent that Reyes argues that by sustaining the government's first objection that the district court impeded the ability to confront his co-defendant, his argument falls short. Reyes's counsel was able to quickly recover and get from Torres exactly what he sought: that, in Torres's opinion, Reyes had nothing whatsoever to do with the planning of acquiring a getaway car. No reversible error occurred.

**C. New Trial**

Reyes finally agues that the district court erred when it denied Reyes's motion for a new trial based on newly discovered evidence. We review an order denying a new trial motion based on newly discovered evidence for an abuse of discretion. *See United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005).

Under Federal Rules of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." To obtain a new trial based on newly discovered evidence, Reyes must show that the evidence (1) was discovered after trial; (2) could not have been discovered sooner with due diligence; (3) was material and not simply impeaching or cumulative; and (4) if presented at a new trial would "probably result in acquittal." *United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007).

In his motion for a new trial, Reyes presented affidavits of two individuals—Daniel Ramirez and Lucy Ocasio. Ramirez claimed in his affidavit that while incarcerated at the Metropolitan Correction Center he came into contact with DeJesus. DeJesus, according to Ramirez, discussed the Credit Union robbery and admitted that it was planned by someone named "Joey"—Torres's nickname. DeJesus further told Ramirez that Reyes had nothing to do with the robbery, and that all of the men agreed that they would blame Reyes if they were caught.

According to Ocasio's affidavit, she dated Berrios at the time of the robbery and witnessed several of the meetings where the robbery was discussed and during the course of these meetings, she never saw Reyes at any of them;

and she claimed that Torres had instructed the others to blame Reyes if any of them were caught.

As the government points out, Ocasio's statements in the affidavit directly contradict her statements made to the FBI in an interview conducted eighteen months before she signed her proffered affidavit. In that interview, she stated that on one occasion, she was present at a meeting among Reyes, Torres, and Berrios. Following the meeting, Berrios told Ocasio that they were discussing robbing the Credit Union. In addition, the government gave Reyes a copy of her interview with the FBI, and Reyes had an opportunity to interview Ocasio prior to trial.

In denying Reyes's motion, the district court found that both affidavits failed the materiality requirement; its primary use would be for impeachment.

We will focus primarily on the statements in the Ramirez affidavit. Ocasio's affidavit, apart from not offering much material support to Reyes's defense, is inconsistent and contradicts her earlier statements. Moreover, Reyes could have discovered this information prior to trial with some diligence.

Addressing the evidence in the Ramirez affidavit, we are not as convinced as the district court that the evidence fails on the materiality requirement. It is true that, typically, newly discovered impeachment evidence does not warrant relief under Rule 33. *See United States v. Woods*, 301 F.3d 556, 563 (7th Cir. 2002); *see also United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991) (finding that newly discovered impeachment evidence can be enough where the conviction depends entirely on the uncorroborated

testimony of a single unreliable witness). This evidence might have had benefits to Reyes beyond impeachment. By supporting his argument that his co-defendants sought to pin the robbery on an unwitting Reyes, the evidence would bolster, to a degree, his defense. Reyes argued that he did not realize that the information he disclosed to his co-defendants would be used in the commission of a crime; therefore, evidence suggesting that they used this disclosure prompted the co-defendants to both commit the crime *and* pin the leadership role on Reyes would support his argument.

We need not go too far down this road, however, as the proffered evidence fails to satisfy the fourth element. It his hard to conceive that the evidence in Ramirez's affidavit would have affected the verdict. Comparing the evidence indicating the extent of Reyes's knowledge of the robbery of the Credit Union—including the specific insider details used during the crime—it is difficult to believe that the testimony of a former cellmate of one of the co-defendants would result in acquittal.

### III. CONCLUSION

Accordingly, Reyes's conviction is AFFIRMED.