In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1340

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ALFONSO TORRES-CHAVEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:09-cr-00967 — **Amy J. St. Eve**, *Judge.*

ARGUED NOVEMBER 13, 2013 — DECIDED MARCH 6, 2014

Before MANION, KANNE, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* Alfonso Torres-Chavez appeals his
convictions on seven felony counts related to his participation
in a conspiracy to distribute cocaine. He challenges three
decisions by the district court: (1) the admission of testimony
from a co-conspirator concerning that co-conspirator's prior
uncharged drug-dealing activity with the defendant; (2) the

denial of the defendant's motion attacking the sufficiency of the evidence identifying the defendant as the individual recorded on a series of incriminating telephone calls; and (3) the refusal to consider post-verdict statements made by several jurors in subsequent *voir dire* proceedings concerning their ability to follow the court's instructions. Finding no basis for reversal, we affirm.

## I.  BACKGROUND

Torres-Chavez's jury trial commenced on September 26, 2011. On September 29, the jury returned a guilty verdict, thereby convicting Torres-Chavez on one count of conspiring with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846; one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1); and three counts of using a cellular telephone to facilitate the distribution conspiracy, in violation of 21 U.S.C. § 843(b). On February 4, 2013, the district court sentenced Torres-Chavez to a total of 168 months' imprisonment, plus five years of supervised release. On appeal, Torres-Chavez raises three claims relating to the conduct of his trial. We briefly introduce each below.

### A.  Other Crimes Evidence

The government's star witness was Bartolo Lucatero, a co-conspirator. Lucatero was charged along with Torres-Chavez, but agreed to cooperate with the government in exchange for leniency. Among other things, Lucatero testified about the trusting nature of his relationship with the defendant in the years leading up to the formation of the charged conspiracy. It was a business relationship founded on a shared history of

drug trafficking. Torres-Chavez objected to Lucatero's testimony about prior instances in which Torres-Chavez recruited Lucatero to accompany a truck driver on a trip transporting marijuana from Phoenix to Chicago. He also objected to testimony concerning prior uncharged cocaine transactions in which the two were involved. The district court admitted the evidence under Fed. R. Evid. 404(b)(2) for the purpose of establishing the relationship between Lucatero and Torres-Chavez. The court contemporaneously instructed the jury to consider the evidence only for that limited purpose.

*B. Sufficiency of the Identification Evidence*

At trial, the government played a series of recorded telephone calls to the jury. Torres-Chavez was caught as a part of a larger operation targeting "La Familia," a drug trafficking cartel based in Michoacán, Mexico, and operating in the Chicago area. Government wiretaps on phones used by one José Gonzalez-Zavala, known in La Familia as "Panda," captured twenty-six conversations about the cocaine transaction underlying the indictment. Twelve of those conversations were with an individual referred to as "Guero," whom the government sought to prove was Torres-Chavez. Toward that end, Lucatero identified Torres-Chavez as Guero, and a contract linguist from the Drug Enforcement Agency testified that the voices matched, as did an additional conspirator. Finally, the government sought to connect Guero to an O'Hare Airport flight record under the name "Alfonso Chavez" on the same day Guero told Panda he needed to catch a plane.

On November 4, 2011, several weeks after the verdict was returned, Torres-Chavez filed a motion for a judgment of

acquittal pursuant to Fed. R. Crim. P. 29(c)(1). In it, he argued that the evidence was not sufficient to prove that Torres-Chavez was Guero. The district court found that it was.

*C. Juror Statements*

After returning the guilty verdict in this case, several jurors were placed back into the Northern District jury pool. Five were questioned during *voir dire* in connection with subsequent trials, particularly concerning whether a defendant's failure to testify in his own defense would influence their deliberative process. Three gave potentially problematic answers, referencing Torres-Chavez's failure to testify in his trial and suggesting that they could not help but draw an adverse inference. The United States Attorney's Office brought these statements to defense counsel's attention, and defense counsel included an allegation of juror bias in his November 4 motion for a judgment of acquittal. The district court found the juror statements inadmissible under Fed. R. Evid. 606(b) and, in the alternative, held that the statements did not show that Torres-Chavez received an unfair trial.

## II.  ANALYSIS

Torres-Chavez believes he is entitled to a new trial for three reasons. First, he argues that the district court erred by admitting Lucatero's testimony describing prior bad acts, because he believes those bad acts were not themselves proved by sufficient evidence. Second, he argues that the district court erred by denying his motion for a judgment of acquittal based on the alleged paucity of evidence identifying him as "Guero" on the incriminating telephone calls. Third, he argues that the juror statements gathered from unrelated court proceedings

are admissible, and that they prove that the jury in his case was biased. We address the issues sequentially, and we affirm the judgment of the district court.

### A. Rule 404(b) Evidence

Federal Rule of Evidence 404(b) prohibits the admission of evidence of an uncharged crime, wrong, or other act committed by the defendant when it is used to prove the defendant's character and that the defendant acted in accordance with that character on a particular occasion. Fed. R. Evid. 404(b)(1). Such evidence may be admissible, however, when it is introduced to prove an issue other than propensity, including but not limited to motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2); *United States v. Taylor*, 522 F.3d 731, 735 (7th Cir. 2008) (Rule 404(b)(2)'s list is "not exhaustive"). Courts within our circuit use a four-part test to determine whether Rule 404(b) evidence is admissible, asking if (1) the evidence is directed towards establishing a matter other than the defendant's propensity to commit the crimes charged; (2) the other act is similar and close enough in time to be relevant; (3) the evidence is sufficient to support a jury finding that the defendant committed the other act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *United States v. Reese*, 666 F.3d 1007, 1015 (7th Cir. 2012).

At trial, cooperating co-defendant Lucatero testified to prior uncharged drug dealing activity with Torres-Chavez. He testified that Torres-Chavez recruited him to accompany a truck driver (and a truckload of marijuana) on three cross-

country trips from Phoenix to Chicago in the spring of 2007, the last of which ended in an interception by law enforcement. Lucatero was questioned when the truck was stopped but did not expose Torres-Chavez, thereby earning the latter's trust for future ventures. Lucatero also testified that he transported and distributed about seven kilograms of cocaine on behalf of Torres-Chavez on three separate occasions thereafter. The district court found the evidence admissible for the purpose of establishing the trusting relationship between Lucatero and the defendant, a contention which Torres-Chavez does not challenge on appeal, and found that the three remaining prongs of the Rule 404(b) test were satisfied. The introduction of the evidence was accompanied by a limiting instruction.

Torres-Chavez argues against the district court's admission of the evidence on narrow grounds. He believes that the third prong of the test, requiring that the evidence be sufficient to support a jury finding that the defendant committed the other act, is not satisfied in this case. The question at the trial level was whether the government proved that the other act occurred by a preponderance of the evidence. *See United States v. Foster*, 652 F.3d 776, 786 (7th Cir. 2011). The question at our level is whether it was an abuse of discretion for the district court to conclude that the government did. *United States v. Richards*, 719 F.3d 746, 758 (7th Cir. 2013). That is a difficult standard for Torres-Chavez to meet. "An abuse of discretion occurs when a district court resolves a matter in a way that no reasonable jurist would, or when its decision strikes us as fundamentally wrong, arbitrary or fanciful." *United States v. Purnell*, 701 F.3d 1186, 1189 (7th Cir. 2012) (internal quotation marks omitted). We ask only whether the district court's

analytical process and result fell within the broad bounds of reasonableness. *Id*.

We find no abuse of discretion on this record. The district court's decision was not only reasonable, it was correct. Lucatero testified as to the nature of each prior drug transaction and as to the involvement of Torres-Chavez therein. Lucatero was an eyewitness. We have said that "it is black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar." *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005). If the testimony of a single eyewitness is sufficient evidence to convince a jury that a defendant committed a charged criminal act beyond a reasonable doubt, then surely it is also sufficient evidence to convince a jury that a defendant committed an uncharged criminal act by a preponderance of the evidence, which we have called "a lower standard." *United States v. DiDomenico*, 78 F.3d 294, 304 (7th Cir. 1996).

In an attempt to argue otherwise, Torres-Chavez relies on our holdings in *United States v. Reyes*, 542 F.3d 588, 593 (7th Cir. 2008), and *United States v. Lindemann*, 85 F.3d 1232, 1238–39 (7th Cir. 1996), for the proposition that some independent corroboration of Lucatero's testimony was required as a matter of law. We find the defendant's argument unpersuasive for three reasons.

First, *Lindemann* is clearly inapposite. That case dealt with co-conspirator hearsay under Fed. R. Evid. 801(d)(2)(E), an issue raising distinct concerns about the attributability of statements that have little bearing on the case before us.

Second, while *Reyes* is more relevant, to read it as imposing a universally applicable corroboration requirement is to go too far. In *Reyes*, the government attempted to prove prior crimes committed by the defendant by introducing testimony from two witnesses that was so facially inadequate it failed to even answer the basic who, what, when, and where questions. 542 F.3d at 592–93. We did note the lack of corroboration, but the point was to emphasize that nothing else existed in the record to save the government's otherwise shaky offering. No such help is necessary when the evidentiary offering is not shaky at all in the first place. Lucatero's was not. His testimony was long on details and certainly facially plausible. Torres-Chavez was free to raise his concerns about a lack of corroboration before the jury, but under these circumstances those concerns go to weight, not sufficiency.

Third, even if a corroboration requirement did exist in this context, Lucatero's testimony *was* corroborated by photographs of vehicles, persons, and controlled substances involved in at least one of the transactions he described. It is true that the government did not produce photographs to confirm every single detail of Lucatero's testimony, but the government could hardly be expected to do so. It is the nature of criminal activity that much of it takes place unobserved, in the figurative (and sometimes literal) shadows. We will not impose a "total" corroboration requirement on the government which would prove in so many cases to be impossible to meet, nor was there any reason for the district court to do so.

In summary, this issue provides no basis for reversal. We not only believe that the district court's decision fell within the "broad bounds of reasonableness," *Purnell*, 701 F.3d at 1189;

we in fact agree with the district court that the evidence in question was admissible.

### B.  Sufficiency of the Identification Evidence

Rule 29 of the Federal Rules of Criminal Procedure permits a defendant to move for a judgment of acquittal even after a guilty verdict is entered if he does not believe the evidence is sufficient to sustain a conviction. Fed. R. Crim. P. 29(c)(1). When faced with a Rule 29 motion, a court asks "whether, after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The movant faces a nearly insurmountable hurdle. *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999). Not only do we view the evidence in the light most favorable to the government, we "defer to the credibility determination of the jury[] and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id*.

At trial, much of the evidence tying Torres-Chavez to the conspiracy came in the form of recorded telephone calls. La Familia, the Mexico-based trafficking organization with which the defendant was involved, did business in the Chicago area primarily through an individual named José Gonzalez-Zavala—"Panda," to his friends. A series of calls took place in May 2013 between Panda, Lucatero, and an individual known as "Guero." Those calls were the mechanism by which the cocaine transactions underlying the indictment were arranged.

The government relied on four sources of evidence to prove that "Guero" was, in fact, Torres-Chavez: (1) Lucatero, who had been friends with Torres-Chavez for five years, identified the voice of Guero on the recorded calls as Torres-Chavez and confirmed his personal knowledge (aside from voice recognition) that the two were one and the same; (2) Stephanie Skelsky, a contract linguist employed by the Drug Enforcement Agency, listened to Torres-Chavez's voice on jail calls recorded following his arrest and testified as to her opinion that it matched the voice of Guero on the calls played at trial; (3) Jorge Ayala-German, a cooperating co-conspirator who had pled guilty under a separate indictment, testified that he had grown familiar with Torres-Chavez's voice while the two were incarcerated together at the Metropolitan Correctional Center ("MCC") and that it matched the voice of Guero on the recorded calls; and (4) United Airlines flight records showed that an "Alfonso Chavez" had flown out of O'Hare International Airport on May 27, 2009, just a few hours after Guero told Panda he needed to get to "the big airport" to catch a flight.

Torres-Chavez moved for a judgment of acquittal on the grounds that there was insufficient evidence identifying him as the individual known as Guero, and the district court denied his motion. We review *de novo*. *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011).

This is not a close call. Federal Rule of Evidence 901(b)(5) makes admissible "[a]n opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the

alleged speaker." The testimony provided by Lucatero, Skelsky, and Ayala-German easily meets that standard. To be sure, evidence is not reasonably persuasive just because it is admissible, but there is nothing inherently *un*persuasive about any of the forms of evidence on which the government relied. Lucatero had known Torres-Chavez for years when he made the identification. Skelsky, as a DEA linguist who understood the Spanish language, was precisely the sort of person we usually see identifying voices on calls like these. *See United States v. Mendiola*, 707 F.3d 735, 739–40 (7th Cir. 2013) (collecting cases). Ayala-German was a cooperating witness with something to gain, but that does not mean *no* rational jury could believe him; his cooperation goes to the weight of his testimony, not to its sufficiency. Finally, whether the supposedly matching flight record was reasonably persuasive or not, it was unnecessary, because the previous three forms of evidence were sufficient in and of themselves. It is not as though they require a leap from inference to speculation. *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) ("A Rule 29 motion calls on the court to distinguish between reasonable inferences and speculation."). In fact, they do not require any inference in the first place. They were direct identifications from lay witnesses with personal knowledge.

In short, viewing the evidence in the light most favorable to the government, we are convinced that a rational jury could believe Torres-Chavez was the individual identified as Guero on the recorded phone calls. We therefore affirm the district court's denial of Torres-Chavez's motion for a judgment of acquittal on those grounds.

### C. Possibility of Juror Bias

Federal Rule of Evidence 606(b) generally prohibits the use of juror statements during an inquiry into the validity of a verdict or indictment:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1). Exceptions to the rule only occur under three circumstances: (1) where extraneous prejudicial information was improperly brought before the jury; (2) where an outside influence was improperly brought to bear on any juror; and (3) where a mistake was made in entering the verdict onto the verdict form. Fed. R. Evid. 606(b)(2). The rule finds its basis in the common law tradition, and it is intended to preserve the privacy of jury deliberations as well as the integrity and finality of their verdicts. *Tanner v. United States*, 483 U.S. 107, 118–20 (1987).

Torres-Chavez did not testify in his own defense at trial. The district court properly instructed the jury not to consider his failure to testify an admission of guilt or to consider it in any way, and we assume juries follow their instructions. *Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008). In the week following the guilty verdict in this case, however, several jurors returned to the Northern District of Illinois jury pool and

were subjected to *voir dire* in connection with possible jury service in unrelated trials. Five of those jurors were questioned concerning their consideration of a defendant's exercise of his right not to testify during trial, and three responded problem-atically.[1]

Juror A ultimately confessed to an inability to follow the law in the new trial for which *voir dire* was being conducted:

> THE COURT: [Y]ou indicated that you would have some problems if the defendant did not testify in this case, am I right about that?
>
> JUROR A: Yes.
>
> THE COURT: … [I]f you're in this courtroom situation and if you are instructed the government has the burden, the defendant has the right not to testify, would you be able to follow that instruction?
>
> JUROR A: I would try, but it's hard because the last case we tried last week it was like the same thing. He didn't testify. Me, I probably want to hear from the other side.
>
> THE COURT: Did the Judge instruct you that you shouldn't consider whether or not he testified?

---

[1] The United States Attorney's Office learned of the jurors' potentially problematic responses through its participation in the subsequent trials in which they were subjected to *voir dire*. Despite the Office's doubt that the statements were admissible in Torres-Chavez's case, it made them available to defense counsel so that the issue could be properly addressed. We commend the government for its candor in this matter and for the even-handed approach it has taken.

JUROR A: I mean, yeah, but—

\* \* \*

THE COURT: … Do you think you could be fair and follow the law … ?

JUROR A: I don't know. From the last trial I just don't understand nobody not testifying. That's just me.

THE COURT: Well, did the jury evaluate the government's evidence in that case?

JUROR A: I mean, yeah, they did, but it was just me. I don't know about anybody else.

THE COURT: [W]ere you able to decide whether or not the government had carried its burden of proof?

JUROR A: Yeah, a little bit. A little. But I still had the doubt as soon as I heard the case knowing he was not defending himself. I still had the little doubt in my head that he probably did it.

\* \* \*

THE COURT: So apart from feeling like maybe you didn't hear both sides, do you feel that the trial was unfair?

JUROR A: Not really.

\* \* \*

THE COURT: Do you understand that [the defendant] has a right to not testify and that exercise of that right cannot be used against him?

JUROR A: I understand it, but I still—I felt—I still think I have an opinion about the situation too.

THE COURT: … If you can't follow the law, you should not be on the jury. If you can follow the law, you should be on the jury. It's that easy.

JUROR A: I probably wouldn't, being honest.

Juror B, questioned in the same trial, was somewhat more equivocal, but likewise could not firmly commit to following the district court's instructions:

COUNSEL: [Juror B] indicated I think she might have difficulty with a defendant who didn't testify.

JUROR B: I did raise my hand for that, and I served last week and I didn't raise my hand for that question last week. After my experience last week, I'm sorry, but I couldn't help it, but that entered into my thought process when I was trying to reach a verdict, that he did not testify. And I felt that if he would have said I wasn't there, I have an alibi, I would have maybe believed him more.

THE COURT: … So I guess the question is if that is what you're instructed, and that will be what you're instructed, can you follow that instruction?

JUROR B: Well, I can say that I will try. But if you want me to be honest, I was surprised about how that did affect me, how I felt after the last trial.

* * *

THE COURT: And I need you—I need you to be able to commit that you can follow [my instructions the defendant's right not to testify].

JUROR B: I can say that I can follow those instructions, but whether or not it's in the back of my mind truthfully I can't say.

* * *

JUROR B: The last case it involved a wiretap, whether there was voice evidence. And I think he didn't want to speak. I think he didn't want us to hear his voice. It's very hard not to assume there was a reason he didn't want us to hear his voice. Now, the jury did reach a decision. We did, but we did all bring that subject up. A lot of us I should say. And I think we deliberated maybe six hours[.]

THE COURT: The judge told you that shouldn't enter into your deliberations?

JUROR B: Oh, certainly. Certainly[.]

* * *

JUROR B: I am being honest when I say one of the first things that came into my mind, well, why doesn't he have an alibi? Why doesn't he say where he was? Why doesn't he defend himself?

Finally, Juror C, questioned in another trial, also equivocated about the issue, but ultimately committed to following the instructions of the district court:

THE COURT: And is there anything about [the prior case] that you feel leaves you predisposed to favoring one side or the other in this case?

JUROR C: Yeah. The defendant didn't testify and that—

THE COURT: Okay.

JUROR C: —really bothered—

THE COURT: And did that leave you with some sense of unfairness?

JUROR C: [Y]es, it did. I didn't feel it was tried right and I—you know what? After—I didn't really come to a conclusion until after I went home that night, and the whole way home I was thinking about it and I've been thinking about it ever since. I wasn't sure. I kind of felt like, you know—at the time I thought we were doing the right thing but it just kept on playing in my head that I wasn't sure about it.

THE COURT: … Can you follow [the] principle whether you agree or not?

JUROR C: I could follow it.

THE COURT: Are you satisfied in your own mind that you can [do so]?

JUROR C: My only—my answer on that was, I thought I could before and I thought I was—I thought I was satisfied, but then afterwards these are the questions that I've been milling around with since Thursday afternoon.

\* \* \*

THE COURT: … [C]an you not hold it against any defendant if he or she does not testify[?]

JUROR C: I believe so. I—yeah, I believe so. I mean, that was my questions. That's where I'm sitting right now. But I believe so. I'm not sure but I believe so.

\* \* \*

THE COURT: Is there anything about th[e former] case that leaves you with a predisposition to favor one side or the other in this case or that leaves you with any doubts about your ability to be fair and impartial in this case, sir?

JUROR C: Just what we spoke about before. I just didn't feel—I felt there were some holes after we left. That's pretty much the gist of it.

\* \* \*

THE COURT: … [C]an [you] be fair to both sides in this case?

JUROR C: If it's yes or no, yes.

THE COURT: Very well.

The jurors' post-trial statements led Torres-Chavez to believe he did not receive a fair trial. Both the Fifth Amendment right to due process and the Sixth Amendment right to an impartial jury protect a defendant against juror bias. *Arreola v. Choudry*, 533 F.3d 601, 605 (7th Cir. 2008). These rights guarantee a jury "capable and willing to decide the case solely on the evidence before it," *Smith v. Phillips*, 455 U.S. 209, 217

(1982), and consistent with the trial court's instructions, *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). Torres-Chavez moved the district court to grant him a new trial, seeking to introduce the juror statements as evidence that the jury disregarded the court's instructions and allowed bias to infect their deliberations. The district court denied the motion because the statements were inadmissible under Rule 606(b), and found in the alternative that the statements did not actually prove that the Torres-Chavez trial was unfair.

We review the district court's evidentiary ruling for an abuse of discretion. *United States v. Henderson*, 736 F.3d 1128, 1130 (7th Cir. 2013). The same standard applies to the district court's consideration of the juror bias issue on the merits, *United States v. Vasquez-Ruiz*, 502 F.3d 700, 704 (7th Cir. 2007), but we need not go that far. It was not an abuse of discretion for the district court to refuse to admit the juror statements into evidence, and without those statements there is no support for Torres-Chavez's claim.

Rule 606(b) draws a line in the sand between evidence of outside influences on the jury's deliberative process and evidence of the jury's own internal processes. *Contrast* Fed. R. Evid. 606(b)(2) *with* Fed. R. Evid. 606(b)(1). Evidence of outside influences is not just admissible; it triggers a presumption of prejudice. *Remmer v. United States*, 347 U.S. 227, 229 (1954). *But see Hall v. Zenk*, 692 F.3d 793, 799–805 (7th Cir. 2012) (discussing confusion among the circuits as to whether *Remmer* remains good law in light of conflicting Supreme Court statements before ultimately concluding that a presumption still exists under limited circumstances). Evidence of *internal* matters, however—including statements or affidavits "about

any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes"—is out. Fed. R. Evid. 606(b)(1). We strictly adhere to the plain language of the rule, especially where the allegations of jury misconduct arise after a verdict has already issued. *See, e.g., United States v. Morales*, 655 F.3d 608, 630–33 (7th Cir. 2011); *United States v. Briggs*, 291 F.3d 958, 963–64 (7th Cir. 2002); *United States v. Febus*, 218 F.3d 784, 795 (7th Cir. 2000); *United States v. Muthana*, 60 F.3d 1217, 1223 (7th Cir. 1995); *United States v. Ford*, 840 F.2d 460, 465–66 (7th Cir. 1988).

The juror statements in this case concern only "intrajury influences on the verdict during the deliberative process," *Ford*, 840 F.2d at 465, and therefore fall squarely within the Rule 606(b)(1) prohibition. They are not admissible under existing law. Torres-Chavez acknowledges the legal status quo, but argues that we should create an additional, judge-made exception to the 606(b)(1) prohibition for statements concerning potential bias against a defendant's exercise of his right to remain silent, as the First Circuit has done for statements exhibiting racial or ethnic bias. *See United States v. Villar*, 586 F.3d 76, 84–88 (1st Cir. 2009). We decline to do so, and we thus join every other circuit court to consider the issue. *See United States v. Kelley*, 461 F.3d 817, 832 (6th Cir. 2006); *United States v. Rutherford*, 371 F.3d 634, 639–40 (9th Cir. 2004); *United States v. Tran*, 122 F.3d 670, 672–73 (8th Cir. 1997); *United States v. Martinez-Moncivais*, 14 F.3d 1030, 1036–37 (5th Cir. 1994); *United States v. Voigt*, 877 F.2d 1465, 1469 (10th Cir. 1989); *United States v. Friedland*, 660 F.2d 919, 927–28 (3d Cir. 1981).

Rule 606(b)(2) already lists the circumstances under which evidence of juror statements should be admitted. Expanding that list by carving out additional prudential exceptions vitiates the rule and threatens the values that undergird it. As the Supreme Court has cautioned, "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." *Tanner*, 483 U.S. at 120–21. We are not prepared to say that *no* circumstances exist which would warrant a prudential exception, but we join our sister circuits in concluding that *these* circumstances do not.

Because we agree with the district court that the juror statements are inadmissible under Rule 606(b), we cannot say that the district court abused its discretion by refusing to consider those statements. Without those statements, there is no basis for an attack on the impartiality of the jury, and we affirm the district court's denial of Torres-Chavez's motion for a judgment of acquittal.

### III. CONCLUSION

In summary, first, the district court did not abuse its discretion by admitting evidence of the defendant's previous drug-dealing relationship with the cooperating co-conspirator, Lucatero. To the contrary, that evidence was correctly admitted. Second, the district court properly denied the defendant's motion attacking the sufficiency of the evidence, because there was plenty of admissible, direct evidence identifying him as the individual referred to as "Guero" on the incriminating calls

recorded by the government. Finally, the district court did not abuse its discretion by refusing to consider statements made by the defendant's jurors in subsequent proceedings concerning their deliberative process. Those statements were indeed inadmissible under Fed. R. Evid. 606(b). We therefore AFFIRM the district court's evidentiary ruling and its denial of the defendant's motion for a judgment of acquittal.