**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Aziz MUTHANA, Defendant–Appellant.**

**No. 94–1971.**

United States Court of Appeals, Seventh Circuit.

Argued May 11, 1995.

Decided July 11, 1995.

Rand Elden, Asst. U.S. Atty., Jerome Krulewitch (argued), Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

Susan G. James, James & Associates, Montgomery, AL (argued), for Aziz Muthana.

Before BAUER, WOOD, JR., and EASTERBROOK, Circuit Judges.

BAUER, Circuit Judge.

Aziz Muthana was convicted by a jury of knowingly and willfully using an export control document which contained a false statement and omitted a material fact to export defense articles in violation of 22 U.S.C. § 2778(c) and 22 C.F.R. §§ 127.2 and 127.3 (1993). The export control document was an air waybill which stated that cargo tendered by Muthana to Royal Jordanian Airlines for shipment to Yemen contained 3,086 pounds of honey rather than approximately 56,000 rounds of ammunition. Muthana challenges his conviction and sentence. We affirm.

## I.

Muthana purchased ten Beretta nine-millimeter semi-automatic pistols, a Smith & Wesson nine-millimeter semi-automatic pistol, twenty Italian-made .380 single action pistols, three assault rifles, and over 70,000 rounds of various types of ammunition in cash from Shore Galleries, Inc., in Lincolnwood, Illinois, between July 17 and August 7, 1993. Shore Galleries is a federally licensed firearms dealer owned by Mitchell Shore. During one of his visits to Shore Galleries, Muthana asked Shore if Shore knew anyone who could assist Muthana in exporting the firearms and ammunition which he had purchased. Shore said that he could and contacted the United States Customs Service ("Customs").

Customs Special Agent Joseph Kupsche, acting in an undercover capacity, telephoned Muthana four times between August 4 and 6, 1993. Their conversations were recorded. In their first conversation, Kupsche told Muthana that Kupsche worked for a fictitious freight forwarder and that Muthana's name and phone number had been given to him by Shore. Muthana told Kupsche that he wanted to ship 10,000 pounds of ammunition to Yemen by air and that the ammunition was for hunting. Kupsche said, "you might be required to get a State Department license" and "[i]t takes about two to three months to get the license." Muthana replied, "No problem." The conversation continued as follows:

> KUPSCHE: I should probably sit down and meet with you some time and . . . give you the forms that you need to export. Okay?
>
> MUTHANA: Alright.
>
> KUPSCHE: And what they are is they're State Department licenses that . . . need to get filled out and they need to . . . be . . . sent to Washington.
>
> MUTHANA: Uh, huh.
>
> KUPSCHE: And then they'll issue the license.

In subsequent conversations, Kupsche and Muthana discussed meeting together where Kupsche would have the applications to obtain the licenses from the Department of State. Kupsche and Muthana were ultimately unable to arrange a meeting because Muthana was leaving for Yemen for two weeks on August 9 via Royal Jordanian Airlines ("Royal Jordanian"). Royal Jordanian flies from O'Hare Airport in Chicago to Yemen

after stops in Amsterdam and Amman, Jordan.

Muthana telephoned Reinhard Meyhoefer, a cargo sales and service manager for Royal Jordanian, on August 6, 1993. Muthana told Meyhoefer that he wanted to ship personal effects and approximately 3,000 pounds of honey on a Royal Jordanian flight departing from Chicago on August 9. Muthana, who had rented a storage locker in Chicago on August 1, arrived at the offices of ADI Domestic Airlines ("ADI") in Elk Grove Village, Illinois, at approximately 2:00 p.m. on August 9 in a rental truck. ADI is a company which has a contract to handle, store, and transport Royal Jordanian's cargo. Muthana's truck contained twenty-three plastic milk crates wrapped in duct tape. ADI employees unloaded and weighed the crates, which weighed 3,086 pounds. Meyhoefer then prepared a rate agreement for the shipment of 3,086 pounds of honey in twenty-three parcels to Aden, Yemen, at $1.15 per pound, for a total cost of $3,548.90. The rate agreement was prepared in the presence of Muthana and Jim Michalarias, an ADI employee. According to Meyhoefer's trial testimony, at no time did Muthana tell him that Muthana was shipping ammunition.

Michalarias prepared a shipper's letter of instruction, which described the number, type, and weight of goods to be shipped, in the presence of Meyhoefer and Muthana. Both Michalarias and Meyhoefer testified at trial that Muthana told Michalarias that the parcels contained honey. Michalarias prepared a Royal Jordanian air waybill, a document used for shipping goods aboard the airline, after the shipper's letter of instruction. The waybill stated that Muthana was shipping 3,086 pounds of honey from O'Hare Airport to Aden, Yemen, via Royal Jordanian. Michalarias reviewed the waybill in detail with Muthana and asked Muthana if the document was correct. Muthana then signed the waybill. Muthana received a copy of the waybill, paid Michalarias $3,100 in cash, promised to pay the balance of the shipping charges later, and left.

Customs agents arrived at ADI's offices later that day. After opening two of Muthana's parcels and discovering large caliber ammunition inside, the agents seized and transported all twenty-three parcels to a Customs facility. The agents then inspected the parcels. Eighteen of the twenty-three parcels contained nothing but ammunition, including 7.62 caliber NATO rounds, nine-millimeter caliber rounds, and .380 caliber rounds. The other five parcels contained bags of the same types of ammunition in five-gallon buckets of honey. The total quantity of ammunition in the parcels was approximately 56,000 rounds.

Muthana, unaware that his parcels had been seized, boarded the 9:00 p.m. Royal Jordanian flight on August 9. Muthana checked five pieces of luggage onto the flight. Muthana did not notify anyone at Royal Jordanian that his luggage contained firearms. A Customs agent inspected the luggage, which consisted of three five-gallon buckets of honey and two suitcases, in a baggage area at the airport. One suitcase was wrapped with rope and duct tape and contained seven Beretta nine-millimeter semiautomatic pistols, a Smith & Wesson nine-millimeter semiautomatic pistol, twenty Italian-made .380 single action pistols, three assault rifles, and approximately 620 rounds of ammunition. The serial numbers of the firearms matched those of the firearms which Muthana had purchased from Shore Galleries in July and August 1993. The luggage was then seized. The government introduced at trial a Department of State certification that Muthana did not have a license to export firearms or ammunition.

Muthana was arrested on August 27, 1993, at O'Hare Airport upon his return from Yemen on a Royal Jordanian flight. Muthana was charged in a three-count superseding indictment on October 28, 1993. Count One charged Muthana with knowingly and willfully attempting to export defense articles to Yemen without a valid export license. 22 U.S.C. § 2778(b)(2) and (c); 22 C.F.R. §§ 127.1, 127.3 (1993). Count Two charged Muthana with knowingly and willfully using an export control document containing a false statement and omitting a material fact to export defense articles. 22 U.S.C. § 2778(c); 22 C.F.R. §§ 127.2, 127.3 (1993). Count Three charged Muthana with knowingly and

willfully delivering firearms and ammunition to a common carrier for transportation and shipment in interstate and foreign commerce without written notice to the carrier. 18 U.S.C. §§ 922(e), 924(a)(1)(D).

Muthana pleaded not guilty and testified in his own defense at trial. Muthana testified that he was unable to read or write English and could speak English only on a limited basis. With respect to his taped conversations with Kupsche, Muthana testified that he believed that Kupsche, not him, was required to obtain a license to export the ammunition. Muthana admitted that he lied to Michalarias about the parcels when Michalarias was preparing the waybill but testified that he later told Meyhoefer that the parcels contained ammunition. Muthana also testified that he concealed the ammunition in honey to avoid Jordanian government authorities.

The jury found Muthana guilty on Count Two of the indictment and not guilty on Count One. The jury was unable to reach a verdict on Count Three, which the district court dismissed on the government's motion. The district court applied Guideline § 2M5.2(a)(1) over Muthana's objection and sentenced him to forty-one months' imprisonment followed by two years of supervised release.

## II.

Muthana first challenges the sufficiency of the evidence to support his conviction on Count Two. Muthana bears a "heavy burden" in making this claim. *United States v. Olson,* 978 F.2d 1472, 1478 (7th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1614, 123 L.Ed.2d 174, 175 (1993). In reviewing his challenge, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). We may reverse a conviction " 'only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt.' " *United*

*States v. Johnson,* 26 F.3d 669, 684 (7th Cir.) (citation omitted), *cert. denied,* — U.S. —, 115 S.Ct. 344, 130 L.Ed.2d 300 (1994).

■ Section 38 of the Arms Export Control Act, 22 U.S.C. § 2778, authorizes the President to control exports of defense items through a licensing system administered by the Department of State. The items which require a license to export are designated as "defense articles" and set forth in the United States Munitions List, 22 C.F.R. § 121.1. The Act proscribes a person from exporting a defense article without a license unless certain exceptions apply. 22 U.S.C. § 2778(b)(2). A Department of State regulation in effect at the time of the offense of conviction provides in relevant part:

> It is unlawful to use any export or intransit control document containing a false statement or misrepresenting or omitting a material fact for the purpose of exporting any defense article ... for which a license or approval is required by this subchapter.

22 C.F.R. § 127.2(a) (1993). This regulation contains a scienter requirement located in 22 U.S.C. § 2778(c), which provides in relevant part:

> Any person who willfully violates any provision of this section or section 2779 of this title, or any rule or regulation issued under either section ... shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than ten years, or both.

In order to convict Muthana of violating 22 C.F.R. § 127.2(a) (1993), the government was required to prove beyond a reasonable doubt that (1) Muthana used an export control document to attempt to export a defense article; (2) the export control document contained a false statement or misrepresented or omitted a material fact; (3) a license was required to export the defense article; and (4) Muthana committed these acts knowingly and willfully. *United States v. Beck,* 615 F.2d 441, 452 (7th Cir.1980).

The first three elements of this offense were established by the government and not contested by Muthana at trial. Muthana used an air waybill to attempt to export ammunition to Yemen. The ammunition was

a defense article which required a license to export. 22 C.F.R. § 121.1 Category III. The waybill was an export control document under the Department of State's regulations, 22 C.F.R. § 127.2(b)(11) (1993), and contained a false statement and omitted a material fact by stating that the twenty-three parcels contained 3,086 pounds of honey rather than approximately 56,000 rounds of ammunition. Thus the only issue before the jury was whether Muthana committed these acts knowingly and willfully.

■ Willfulness is the "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991); *see also Ratzlaf v. United States,* —— U.S. ——, ——, 114 S.Ct. 655, 663, 126 L.Ed.2d 615 (1994) (holding that the willfulness requirement of the antistructuring statute, 31 U.S.C. § 5324, requires proof of the defendant's knowledge that the structuring in which he engaged was unlawful). In *Beck*, we interpreted the willfulness requirement of 22 U.S.C. § 2778(b)(2) as requiring that the prosecutor "show that the defendant was aware of a legal duty not to export the [defense] articles." *Beck*, 615 F.2d at 451; *accord, e.g., United States v. Tsai*, 954 F.2d 155, 162 (3d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 93, 121 L.Ed.2d 54 (1992); *United States v. Murphy*, 852 F.2d 1, 7 (1st Cir. 1988), *cert. denied,* 489 U.S. 1022, 109 S.Ct. 1145, 103 L.Ed.2d 205 (1989). More recently, in *United States v. Obiechie*, 38 F.3d 309 (7th Cir.1994), we interpreted 18 U.S.C. § 924(a)(1)(D), which establishes criminal penalties for any person who "willfully violates" 18 U.S.C. § 922(a)(1)(A). Section 922(a)(1)(A) proscribes engaging in the business of dealing firearms without a license. Relying heavily on the Supreme Court's decision in *Ratzlaf*, we held that, while the term "knowingly" in the statute referred "only to the intent to do the act that is proscribed by law," the term "willfully" required "knowledge of the law." *Id.* at 315. In order to meet the willfulness requirement of 22 C.F.R. § 127.2(a) (1993), the government was

therefore required to prove that Muthana knew that making a false statement or misrepresenting or omitting a material fact on the waybill was illegal.[1]

■ The evidence, viewed in the light most favorable to the government, was sufficient to establish that Muthana knowingly and willfully lied on the waybill. Muthana told Michalarias when Michalarias was preparing the waybill that the parcels contained only honey. Muthana knew that this was a lie and that the parcels instead contained thousands of rounds of ammunition. Michalarias reviewed the waybill in detail with Muthana and asked Muthana if the document was correct prior to Muthana signing it. Muthana thus clearly "intend[ed] to do the act" proscribed by 22 C.F.R. § 127.2(a) (1993). *See Obiechie*, 38 F.3d at 315. The taped conversations between Muthana and Kupsche demonstrated that Muthana knew that a license from the Department of State, which he did not have, was required to export the ammunition to Yemen and that he would have to wait two to three months to obtain one. The jury could have reasonably inferred from these conversations that Muthana also knew that it was unlawful to lie on the waybill.

Rather than wait two to three months to obtain the license, Muthana attempted to export the ammunition immediately by concealing it in plastic milk crates wrapped in duct tape. Muthana also attempted to export thirty-one firearms and more ammunition in his luggage on the same flight without telling anyone at Royal Jordanian. This conduct further supports the jury's finding that Muthana willfully violated the law. *See Ratzlaf,* —— U.S. at —— n. 19, 114 S.Ct. at 663 n. 19 (the jury may "find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct.").

Muthana insists that his trial testimony established that his conduct was not willful. According to this testimony, Muthana was

---

1. The district court's willfulness instruction, which Muthana does not challenge on appeal, is consistent with this view. The district court instructed the jury that "[a]n act is done willfully if done voluntarily and intentionally with the purpose of avoiding a known legal duty as charged in the indictment."

unable to read or write English, he could speak English only on a limited basis, and he believed that Kupsche was required to obtain a license to export the ammunition. This testimony was unsupported by the record. Shore testified that he had no difficulty communicating with Muthana in English during their transactions. The taped conversations between Muthana and Kupsche demonstrated that Muthana had no difficulty understanding English, and Kupsche clearly told Muthana that Muthana was required to obtain the license. Shore and Lucy Gardner, from whom Muthana rented the storage locker, testified that Muthana could read and write English. Muthana also testified that he concealed the ammunition to avoid Jordanian, not American, authorities. This assertion was belied by his later testimony that he told Meyhoefer, an employee of the Jordanian government, that the parcels contained ammunition (which Meyhoefer denied).

Muthana's credibility was further impeached by evidence that he had repeatedly lied about his activities. Receipts from Shore Galleries indicated that Muthana told Shore that his firearms and ammunition purchases were for collection or gifts. Muthana told Kupsche that the ammunition was for hunting. The bulk of the ammunition was military rounds unsuitable for hunting. Muthana told Gardner that he would be storing honey in the storage locker. A detective of the Des Plaines, Illinois, police department conducting surveillance observed Muthana on two occasions drive from Shore Galleries to the storage locker and unload boxes there. Muthana admitted that he lied to Michalarias about the parcels when Michalarias was preparing the waybill. Muthana signed the document knowing that the information contained therein was false.

■ The jury believed the government's witnesses and disbelieved Muthana in convicting him on Count Two. We will not reweigh this determination. Assessing a witness' credibility "is a matter inherently within the province of the jury," and arguments concerning credibility are "wasted on an appellate court." *United States v. Hatchett,* 31 F.3d 1411, 1416 (7th Cir.1994) (citations and internal quotation marks omitted).

■ Muthana argues that his acquittal on Count One established the insufficiency of the evidence on Count Two. The only issue before the jury on Count One was whether Muthana knowingly and willfully attempted to export ammunition and firearms to Yemen without a license. This issue is distinct from whether Muthana knowingly and willfully lied on the waybill; the jury may have rationally concluded that Muthana did not know that he was required to obtain a license to export firearms and ammunition, but that he was aware that lying on an export control document was illegal. The verdicts thus are not necessarily inconsistent. Even taking Muthana's argument for all that it may be worth, his claim nevertheless fails. A conviction by a jury on one count cannot be reversed simply because it was inconsistent with the jury's verdict of acquittal on another count. *United States v. Powell,* 469 U.S. 57, 69, 105 S.Ct. 471, 479, 83 L.Ed.2d 461 (1984); *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Lahey,* 55 F.3d 1289, 1296 (7th Cir.1995); *United States v. Scop,* 940 F.2d 1004, 1007 (7th Cir.1991).

■ Muthana's asserts that post-verdict comments by jurors expressing confusion concerning the district court's willfulness instruction require reversal. The comments were made on the record after the jury had been polled on Count Two upon Muthana's timely request. Fed.R.Crim.P. 31(d); *United States v. Marinari,* 32 F.3d 1209, 1212–13 (7th Cir.1994). The twelfth juror's assent to the verdict rendered the verdict final. *Marinari,* 32 F.3d at 1213. Juror testimony regarding the jury's deliberations is not admissible to impeach the verdict unless an extraneous influence was alleged to have affected the jury. Fed.R.Evid. 606(b); *Tanner v. United States,* 483 U.S. 107, 121, 107 S.Ct. 2739, 2748, 97 L.Ed.2d 90 (1987); *Gacy v. Welborn,* 994 F.2d 305, 313 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 269, 126 L.Ed.2d 220 (1993). The jurors' comments are barred by Rule 606(b).

### III.

■ Muthana contends that the district court erroneously applied Guideline § 2M5.2

to his conviction rather than Guideline § 2K2.1. Guideline § 2M5.2(a)(1) establishes a base offense level of twenty-two and applies to offenses involving the "exportation of arms, munitions, or military equipment or services without [a] required validated export license." The version of Guideline § 2K2.1(a)(7) effective November 1, 1993, establishes a base offense level of twelve and applies to offenses involving unlawful receipt, possession, transportation of, or transactions involving, firearms or ammunition. Muthana's challenge to the district court's interpretation of the Sentencing Guidelines is a question of law which we review *de novo*. *United States v. Ford*, 21 F.3d 759, 765 (7th Cir. 1994); *United States v. Gaines*, 7 F.3d 101, 103 (7th Cir.1993).

In *United States v. Galvan–Revuelta*, 958 F.2d 66, 68–69 (5th Cir.1992), the Fifth Circuit rejected an argument identical to Muthana's. The defendant in *Galvan–Revuelta* was convicted of exporting 10,181 rounds of various caliber ammunition in violation of 22 U.S.C. § 2778(b)(1)(A). *Id.* at 67. The court held that the district court correctly applied Guideline § 2M5.2 to the defendant's conviction rather than Guideline § 2K2.1. *Id.* at 69.

■ We agree with the Fifth Circuit's conclusion that Guideline § 2M5.2 properly applies to violations of 22 U.S.C. § 2778 involving ammunition. The statutory index of the Guidelines, United States Sentencing Commission, *Guidelines Manual*, App. A (Nov.1993), states that Guideline § 2M5.2 is the only Guideline applicable to offense conduct in violation of 22 U.S.C. § 2778. Muthana was convicted of violating 22 C.F.R. § 127.2(a) (1993), a Department of State regulation issued under 22 U.S.C. § 2778. Guideline § 2M5.2 therefore applies to his conviction unless this is an "atypical case" in light of the offense conduct and the statute. U.S.S.G.App. A intro. comment.; *see Galvan–Revuelta*, 958 F.2d at 68.

■ This case is not atypical because Muthana's offense involved only ammunition. Application Note One of Guideline § 2M5.2 makes clear that the Sentencing Commission intended the Guideline to apply to these offenses:

Under 22 U.S.C. § 2778, the President is authorized ... to control exports of defense articles and defense services that he deems critical to a security or foreign policy interest of the United States. The items subject to control constitute the United States Munitions List, which is set out in 22 C.F.R. Part 121.1. Included in this list are such things as military aircraft, helicopters, artillery, shells, missiles, rockets, bombs, vessels of war, explosives, military and space electronics, and certain firearms.

Contrary to Muthana's position, the items set forth in the Application Note are not an exclusive list of the defense articles subject to Guideline § 2M5.2. *Galvan–Revuelta*, 958 F.2d at 68. The Application Note list is merely exemplary of the items found in the United States Munitions List, which spans almost nine pages of condensed print in the Code of Federal Regulations. And the ammunition found in Muthana's parcels is included within the Munitions List. 22 C.F.R. § 121.1 Category III.

■ Muthana next contends that, even if Guideline § 2M5.2 applies to his conviction, the district court erred by applying Guideline § 2M5.2(a)(1) rather than Guideline § 2M5.2(a)(2). Guideline § 2M5.2(a)(2) establishes a base offense level of fourteen "if the offense involved only non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed ten." Muthana's offense involved approximately 56,000 rounds of ammunition, so Guideline § 2M5.2(a)(2) does not apply. Muthana also challenges the district court's discretionary refusal to depart downward from the Guidelines because his offense conduct posed no risk of harm to a security or foreign policy interest of the United States. *See* U.S.S.G. § 2M5.2, comment. (n. 1). We have no jurisdiction over a district court's discretionary refusal to depart downward from the Guidelines. *E.g., United States v. Wright*, 37 F.3d 358, 360–61 (7th Cir.1994).

■ Muthana's final challenge to his sentence is that the government engaged in "sentencing entrapment," more appropriately referred to as sentencing manipulation, by

allowing him to continue to purchase firearms and ammunition from Shore Galleries. Sentencing manipulation, as distinct from a claim of outrageous government conduct—a theory of due process unavailable to criminal defendants in this circuit, *United States v. Boyd,* 55 F.3d 239, 241–42 (7th Cir.1995)—occurs "when the government engages in improper conduct that has the effect of increasing a defendant's sentence." *United States v. Okey,* 47 F.3d 238, 240 (7th Cir. 1995). Although it is an open question whether these claims are even cognizable in this circuit, *id.,* Muthana's claim is completely without merit. The government had absolutely nothing to do with his firearms and ammunition purchases. Muthana essentially asserts that the government should have arrested him before he committed his crime. Law enforcement officers have no such obligation. *Id.* at 241.

For the foregoing reasons, the conviction and sentence of Aziz Muthana are

AFFIRMED.