[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11035

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

CHRISTOPHER DANIEL STINES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cr-20566-JEM-1

_____

Before WILSON, LUCK, and LAGOA, Circuit Judges.

WILSON, Circuit Judge:

In this sentencing appeal, we interpret U.S.S.G. § 2M5.2(a)(2) for the first time in a published decision. That subsection sets a lower base offense level for defendants convicted of illegally exporting weapons if the offense involved only non-fully automatic small arms and there were no more than two weapons. The question here is whether a defendant who exports enough weapons parts for two operable firearms, along with additional parts to service additional firearms, can take advantage of the lower base offense level. After careful review, and with the benefit of oral argument, we answer that question in the negative. Such an offense involves more than the two weapons § 2M5.2(a)(2) allows. We therefore affirm.

I

One late-summer day in 2019, Christopher Stines, a Haitian gunsmith, arrived at Miami International Airport. He was scheduled to take Air France Flight 619 to Port-au-Prince, Haiti. As it turned out, United States Customs and Border Protection agents were conducting an outbound border search that day. When the agents searched Stines's luggage, they found 23 AR-15 parts: eight triggers, five selector switches, three hammers, two disconnectors, three hammer and trigger pins, and two trigger guards. These parts are designated "defense articles" by the United States

Munitions List, and they cannot be exported from the United States without an export license.  Stines did not have an export license.

The authorities detained Stines for questioning.  After waiving his *Miranda* rights, Stines agreed to speak with agents from Homeland Security Investigations (HSI).  He told the agents that he had purchased weapons only a few times through various websites.  A search of his iPhone, however, cast doubt on that claim.  The email account on Stines's iPhone contained more than 20 invoices for purchases of weapons parts dating back to 2012.  An HSI agent inquired whether Stines had exported these parts, but Stines did not respond, and the agent ended the interview.  Federal law enforcement conducted a follow-up investigation and found that Stines had purchased hundreds of weapons parts between 2013 and 2019.  He had those parts shipped to the residence of his aunt and uncle in Homestead, Florida.

The government filed an indictment charging Stines with smuggling goods from the United States in violation of 18 U.S.C. § 554(a) (Count One), and with attempting to unlawfully export defense articles in violation of 22 U.S.C. § 2778(b)(2) and (c) (Count Two).  Stines pleaded guilty to Count One in exchange for the government dismissing Count Two.

Following the guilty plea, the United States Probation Office prepared a presentence investigation report (PSI).  The PSI explained that a probation officer had confirmed with the government that the 23 weapons parts seized from Stines "were not capable of being converted to more than two firearms."  But the PSI

also stated that when considering all the weapons parts Stines had purchased since 2013, those parts could be converted to at least four firearms. The PSI then calculated Stines's base offense level as 26, pursuant to § 2M5.2(a)(1) of the United States Sentencing Guidelines. After a three-point reduction for acceptance of responsibility and assisting authorities, Stines's total offense level was 23. With a criminal history category of I, his recommended Guidelines range was 46–57 months.

Stines objected to the PSI, arguing that, pursuant to § 2M5.2(a)(2), his base offense level should have been 14 rather than 26 because the weapons parts that were seized could be converted to only two functional weapons. He also filed a motion for a downward departure. At the sentencing hearing, the district court overruled Stines's objection and denied his motion for a downward departure. Although the district court did not explicitly address Stines's objection to his base offense level, it explained its reasoning for denying the downward departure. The district court observed that Stines appeared to have been working in concert with the Haitian police force, who were engaged "in fire-fights with the Haitian Army." Noting the "extremely volatile political situation" in Haiti, the court found that Stines's conduct affected the foreign policy interests of the United States, which militated against granting a downward departure. Accordingly, the court sentenced Stines to 46 months' imprisonment and two years of supervised release—a sentence at the low end of the Guidelines range.

## II

On appeal, Stines argues that the district court erred in overruling his objection to his base offense level.  He also contends that the district court should have granted a downward departure from the Sentencing Guidelines.  We address those contentions in turn.

## A

We review de novo the district court's interpretation and application of the Sentencing Guidelines, and we review its underlying factual findings for clear error.  *United States v. Maddox*, 803 F.3d 1215, 1220 (11th Cir. 2015) (per curiam).  "When interpreting the guidelines, we apply the 'traditional rules of statutory construction[.]'"  *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011) (quoting *United States v. Shannon*, 631 F.3d 1187, 1189 (11th Cir. 2011)).  The Guideline at issue, § 2M5.2, "Exportation of Arms, Munitions, or Military Equipment or Services Without Required Validated Export License," provides:

(a) Base Offense Level:

(1) **26**, except as provided in subdivision (2) below;

(2) **14**, if the offense involved only (A) non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed two, (B) ammunition for non-fully automatic small arms, and the number of rounds did not exceed 500, or (C) both.

6                    Opinion of the Court                    20-11035

U.S.S.G. § 2M5.2.

Stines does not contest that his offense involved the exportation of weapons parts and thus falls under the umbrella of § 2M5.2(a).  He argues, however, that his offense fits within § 2M5.2(a)(2)(A)'s carveout for less serious offenses.

To that end, Stines makes two arguments.  First, he argues that his relevant conduct for sentencing purposes encompasses only the 23 AR-15 parts that were seized at the airport and with which he was charged.  Although the government produced invoices showing that Stines purchased hundreds of weapons parts over the last decade, Stines argues that *purchasing* weapons parts is not by itself criminal activity.  Without a showing that Stines exported those parts, the argument goes, the purchases are not relevant conduct for sentencing purposes.  The government does not meaningfully dispute this point in its brief.  Second—and building on his first argument—Stines contends that his offense for exportation of 23 weapons parts is an "offense involv[ing] only [ ] non-fully automatic small arms," where "the number of weapons did not exceed two."  *See* § 2M5.2(a)(2)(A).  That is so, he argues, because the 23 weapons parts could be converted to no more than two fully-functioning AR-15s.  As a result, he says that he was entitled to the lower base offense level of 14 under § 2M5.2(a)(2).  The government does not dispute that AR-15s are non-fully automatic small arms, but it argues that Stines's offense cannot qualify for the lower base offense level because the carveout does not apply to offenses involving firearm *parts*.

20-11035                Opinion of the Court                    7

Resolution of this case does not require us to decide whether Stines is correct on the first point because, for the reasons explained below, he cannot qualify for the lower base offense level even assuming his offense involved only 23 weapons parts.

As a starting point, we must consider whether subsection (a)(2) can ever apply to an offense like Stines's that involves AR-15 parts. We think it can for a simple reason: the Guidelines do not purport to distinguish between *assembled* and *disassembled* weapons. At least in theory, then, an offense involving nothing more than the parts of two AR-15s—that is, two AR-15s broken down to their components—could fit within the scope of § 2M5.2(a)(2).

This view is supported by the fact that appellate courts, including this Court, have equated "weaponry" with component parts for weaponry, when interpreting prior versions of § 2M5.2. For example, in *United States v. Fu Chin Chung*, we concluded that the Guidelines did not distinguish between sophisticated weaponry and parts that could be mapped to sophisticated weaponry. 931 F.2d 43, 46 (11th Cir. 1991) (per curiam) ("[W]e have no difficulty in concluding that . . . the cathode assembly that is part of [a missile] guidance system, constitutes sophisticated weaponry."); *see also United States v. Tsai*, 954 F.2d 155, 163 (3d Cir. 1992) ("[I]t is sufficient if the item in question is a *component* of a sophisticated weapon or weapons system. That is the more sensible reading of the Guideline since otherwise the enhancement would be inapplicable to a defendant who separately shipped component parts of a sophisticated weapons system."); *United States v.*

*Nissen*, 928 F.2d 690, 694 (5th Cir. 1991) (per curiam) (holding that parts were "sophisticated weaponry" because they "were 'involved' in a tangible way with 'sophisticated weaponry.'"). Because the term "weaponry," which was used in the prior version of § 2M5.2, is synonymous with the term "weapons," which is used in the current version of § 2M5.2, *see Weaponry, Oxford English Dictionary* (3d ed.) (defining the term "weaponry" as "[w]eapons collectively"), we see no reason to depart from our, and our sister courts', prior interpretation.

A simple example illustrates the point. Imagine that a district judge is tasked with sentencing a defendant who tried to smuggle two AR-15s out of the country by disassembling the guns and placing their parts in his luggage. On those facts, the district judge could find that the offense "involved only [ ] non-fully automatic small arms," albeit in disassembled form, "and the number of weapons did not exceed two." § 2M5.2(a)(2). Such an offense would thus qualify for a base offense level of 14.

Stines's offense, however, is unlike the one in our hypothetical because his offense did not involve a set of parts that could be mapped to only two AR-15s. His offense involved, for example, eight AR-15 triggers that would service eight AR-15s. So to the extent Stines's offense involving AR-15 *parts* can be described as an offense involving non-fully automatic small arms, the number of AR-15s involved would exceed the maximum two weapons permitted by subsection (a)(2)(A).

In fairness to Stines, we recognize that our interpretation could lead to results that are at least counterintuitive. *See* Oral Argument Recording at 6:00–6:44. Under our reading, for instance, a defendant exporting just three AR-15 triggers—and nothing else— would get the higher base offense level (because those triggers would service three AR-15s), while a defendant with two fully operable AR-15s would get the lower base offense level. Yet for at least two reasons, this sort of hypothetical does not persuade us to depart from the Guidelines' plain meaning.

First, we apply the absurd results canon quite cautiously, and we cannot say that it is truly absurd to measure the harm caused by the smuggling of weapons parts by mapping those parts to the weapons they would service.[1] *See CBS Inc. v. Prime Time 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001). Second, the absurd results canon could cut both ways here. Under Stines's approach, we would focus on the number of fully-functioning weapons to which the relevant weapons parts could be converted. The government's brief points out that, under that view, "[a] criminal

---

[1] We note that the Ninth Circuit, without even mentioning the absurd results canon, held that offenses involving the exportation of military equipment, such as night-vision devices, trigger a base offense level of 26. *See United States v. Carper*, 659 F.3d 923, 925 (9th Cir. 2011). Such offenses did not fit within § 2M5.2(a)(2) because they did not involve "non-fully automatic small arms." *Id.* Though one might question the wisdom of treating a defendant with one set of night-vision goggles more harshly than a defendant with two AR-15s, the Ninth Circuit found itself bound to follow the "plain meaning of . . . § 2M5.2(a)(2)." *Id.*

who exported thousands of nearly operable firearms—perhaps missing only one necessary piece—would automatically receive a base offense level of 14." That result is at least as dubious as any that our reading might produce. Therefore, we adhere to the Guidelines' plain meaning, under which the district court correctly applied a base offense level of 26.

## B

The second issue in this appeal is straightforward. Stines argues that the district court should have departed downward from the recommended Guidelines range when imposing his sentence. Stines points to Application Note 1 of the Guidelines, which provides that "[t]he base offense level assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States. In the unusual case where the offense conduct posed no such risk, a downward departure may be warranted." U.S.S.G. § 2M5.2 n.1. Stines argues that his conduct posed no risk to national security, and that, accordingly, the district court should have departed downward.

The problem for Stines is that a district court's denial of a downward departure request is a discretionary decision that is not reviewable unless the district court erroneously believed it lacked the authority to grant one. *United States v. Chase*, 174 F.3d 1193, 1195 (11th Cir. 1999). That was not the case here. The district court reasoned that a downward departure was unwarranted because Stines's conduct had the potential to harm national security. In support of its finding, the court referenced political instability

and violence in Haiti, the proximity of Haiti to the United States, and the fact that Stines had worked as a gunsmith for the Haitian police, who were at times "engaged in fire-fights" with the Haitian government.  Because the district court knew it had the authority to grant a downward departure but chose not to grant one, we lack jurisdiction to review that determination.  *See id.*

## III

In conclusion, we hold that: (1) the district court applied the correct base offense level because Stines's offense does not fit within the narrow carveout set forth in § 2M5.2(a)(2)(A); and (2) we lack jurisdiction to review the district court's discretionary decision not to depart downward from the Guidelines.  Accordingly, we affirm.

**AFFIRMED.**

20-11035 LUCK, J., Concurring in part and in the judgment        1

LUCK, Circuit Judge, concurring in part and in the judgment:

The majority opinion concludes that: (1) we don't have jurisdiction to review the district court's denial of Christopher Daniel Stines's motion for downward departure under application note one in sentencing guideline section 2M5.2; and (2) the district court correctly applied guideline section 2M5.2(a)(1)'s base offense level of twenty-six because Stines's offense conduct didn't fit within the narrow carveout for a base offense level of fourteen in section 2M5.2(a)(2). I proudly join the part of the majority opinion (part II.B) on the downward departure issue. As to the base offense level issue (part II.A), I agree with the majority opinion's conclusion that the base offense level is twenty-six under section 2M5.2(a)(1), and the narrow carveout in section 2M5.2(a)(2) doesn't apply, but I would get there in a slightly different way.

Everyone agrees that guideline section 2M5.2 applies to Stines's attempted shipment of gun parts. The only question is which base offense level within section 2M5.2 applies here. There are two options. The first option is in section 2M5.2(a)(1), which sets a default base offense level of twenty-six for offense conduct that falls within the guideline for the exportation of arms, munitions, or military equipment or services without a required validated export license. U.S.S.G. § 2M5.2(a)(1). The second option is a "narrow" "except[ion]" to the default base offense level. *Id.*; *see also id.* App. C, Amend. 753 (Reason for Amendment). "[I]f the offense involved only . . . non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not

20-11035 Luck, J., Concurring in part and in the judgment    2

exceed two," then the base offense level is fourteen instead of twenty-six. *Id.* § 2M5.2(a)(2)(A).[1]

The district court calculated Stines's advisory guideline range using the default base offense level in section 2M5.2(a)(1). Stines argued to the district court, and argues to us on appeal, that his offense level should have been calculated using the narrow exception in section 2M5.2(a)(2)(A) because the gun parts he attempted to export, if assembled, could make only two complete AR-15 rifles—with some parts to spare—which are non-fully automatic small arms and no more than two weapons. So, the issue is whether the twenty-three gun parts that Stines attempted to export into Haiti are "non-fully automatic small arms." Are gun parts "arms"? If they're not, then the narrow exception—which only applies to "non-fully automatic small arms"—doesn't apply, and the default base offense level does.

The section 2M5.2(a)(2)(A) narrow exception has three textual clues that gun parts are not "arms." First, the term "arms" is not defined in the guidelines, but the *Oxford English Dictionary* defines "arms" as "[w]eapons of war or combat; (items of) military equipment, both offensive and defensive"; "[f]irearms; [and] weapons, such as pistols, rifles, shotguns, or muskets, from which a

---

[1] The narrow exception also applies "if the offense involved only . . . ammunition for non-fully automatic small arms, and the number of rounds did not exceed 500," *id.* § 2M5.2(a)(2)(B), but this is not an ammunition case, so this part of the narrow exception doesn't apply to Stines.

20-11035 Luck, J., Concurring in part and in the judgment        3

missile can be propelled at speed by means of an explosive charge." *Arms*, Oxford English Dictionary (online ed.) (last visited Apr. 19, 2022). *See United States v. Dougherty*, 754 F.3d 1353, 1359 (11th Cir. 2014) (using dictionaries, including the *Oxford English Dictionary*, to define the undefined guideline term "immediate flight"). Triggers, switches, hammers, disconnectors, pins, and guards—the parts Stines attempted to export—may be components of an offensive or defensive weapon, but they are not themselves weapons. No one ever took just a trigger or just a switch (without more) into combat or war.

Second, the section 2M5.2(a)(2)(A) narrow exception gives some examples of "small arms." After the phrase "small arms," the narrow exception lists, inside a parenthetical, "rifles, handguns, or shotguns." U.S.S.G. § 2M5.2(a)(2)(A). Those are the kinds of "small arms" that fall within the narrow exception to the default base offense level for exporting munitions without a license. Each of the examples in the narrow exception supports the common definition of "arms." They are each weapons of war or combat and firearms. But the parts Stines had in his suitcase—like disconnectors and pins—are not similar to, or the equivalent of, rifles, handguns, or shotguns. A disconnector, unlike those guns, can't propel a missile.

And third, section 2M5.2(a)(2)(A) says that the narrow exception applies "*only*" to "non-fully automatic small arms" like "rifles, handguns, or shotguns." *Id.* (emphasis added). By adding the word "only," the guidelines emphasized that anything that is not a

20-11035 LUCK, J., Concurring in part and in the judgment        4

"small arm" like a rifle, handgun, or shotgun does not fall within the narrow exception. As the Fifth Circuit succinctly explained in interpreting the same guideline, "'only' means 'only.'" *United States v. Diaz-Gomez*, 680 F.3d 477, 480 (5th Cir. 2012). Gun parts are not "only" rifles, handguns, or shotguns. They are the parts of those things, but they are not "only" those things.

The few circuits that have interpreted the section 2M5.2(a)(2)(A) narrow exception have read it the same way. The narrow exception now includes "non-fully automatic small arms" and "ammunition," but before 2011, section 2M5.2(a)(2) only applied to "non-fully automatic small arms." "Ammunition" wasn't mentioned. Before the 2011 amendment, the Seventh and Fifth Circuits addressed whether exporting ammunition fell within the carveout to the default base offense level.

In *United States v. Muthana*, 60 F.3d 1217 (7th Cir. 1995), the defendant was convicted of "knowingly and willfully using an export control document which contained a false statement and omitted a material fact to export defense articles." *Id.* at 1219. The defendant wrote on the export control document that the "shipment to Yemen contained 3,086 pounds of honey rather than approximately 56,000 rounds of ammunition." *Id.* As here, the *Muthana* defendant argued that the district court erred in applying the default base offense level rather than the base offense level in the section 2M5.2(a)(2) narrow exception. *Id.* at 1224. The narrow exception, the court explained, "establishes a base offense level of fourteen 'if the offense involved only non-fully automatic small

20-11035 LUCK, J., Concurring in part and in the judgment        5

arms (rifles, handguns, or shotguns), and the number of weapons did not exceed ten.'" *Id.* (quoting section 2M5.2(a)(2)).  (The narrow exception has since been amended to two weapons.)  The Seventh Circuit rejected the defendant's argument because his "offense involved approximately 56,000 rounds of ammunition, so [g]uideline [section] 2M5.2(a)(2) d[id] not apply." *Id.*

The Fifth Circuit reached the same conclusion in *Diaz-Gomez*.  There, the defendant pleaded guilty to "(1) attempting to export a nine-millimeter semi-automatic handgun, five ammunition magazines, 611 rounds of nine-millimeter ammunition, and fifty rounds of .38 caliber ammunition, and (2) concealing the items for export." *Diaz-Gomez*, 680 F.3d at 478.  The defendant argued that the default base offense level in section 2M5.2(a)(1) didn't apply to his offense conduct "because he pleaded guilty to an offense involving only one semi-automatic weapon." *Id.* at 479.  The Fifth Circuit focused on "whether the use of the word 'only' in subsection (a)(2) limits the application of the lower base offense level to an offense that truly involves *only* non-fully automatic weapons and no ammunition." *Id.* at 480.  The court explained that it saw "no reason to interpret the plain meaning of the term 'only' to mean anything other than 'only.'" *Id.*  The defendant "did not have 'only' one small gun hidden in his car—he also had more than 600 rounds of ammunition that could be used in the gun," and "the guideline does not permit finding an exception for including ammunition." *Id.* at 480–81 (quoting *United States v. Sero*, 520 F.3d 187, 190 (2d Cir. 2008)).

20-11035 LUCK, J., Concurring in part and in the judgment        6

Just as one necessary component of a gun—the ammunition—is not "only" an "arm," so too is another necessary part of the gun—the trigger—not only an arm. The hilt of a sword is a component of a weapon, but it is not itself a weapon. By itself—like a trigger or a guard—the hilt does nothing. Triggers and guards are parts of a gun, but they are not themselves weapons used in combat like "rifles, handguns, or shotguns." Stines's gun parts do not fall within the section 2M5.2(a)(2)(A) narrow exception.

The majority opinion relies on *United States v. Fu Chin Chung*, 931 F.2d 43 (11th Cir. 1991); *United States v. Tsai*, 954 F.2d 155 (3d Cir. 1992); and *United States v. Nissen*, 928 F.2d 690 (5th Cir. 1991) to reach the opposite conclusion: that the section 2M5.2(a)(2)(A) narrow exception applies to gun parts. But those cases interpreted the outdated version of section 2M5.2 that hasn't existed in the sentencing guidelines for three decades. In 1990, the sentencing commission scrapped the entire guideline—the whole thing—and completely rewrote it "to better distinguish the more and less serious forms of offense conduct covered" by section 2M5.2. *See* U.S.S.G. App. C, Amend. 337.

Structurally, the sentencing commission flipped the default and the exception. In the pre-1990 version, the default was the lower base offense level of fourteen and the exception was the higher base offense level of twenty-two. *Compare id.* § 2M5.2(a) (1987) ("Base Offense Level (Apply the greater): (1) 22, if sophisticated weaponry was involved; or (2) 14."), *with id.* § 2M5.2(a)

20-11035 Luck, J., Concurring in part and in the judgment          7

(2011) ("Base Offense Level:  (1) 26, except as provided in subdivision (2) below; (2) 14, if the offense involved only (A) non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed two . . . .").  The higher exception applied only if the defendant attempted to export "sophisticated weaponry"; exporting any other arm, munition, or military equipment got the lower offense level.  But after 1990, each and every attempted exportation of munitions without a license fell within the higher default base offense level, and the only "except[ion]" was the "narrow" carveout for "small arms" and their "ammunition." *See id.* § 2M5.2(a)(1) (2011); *see also id.* App. C, Amend. 753 (Reason for Amendment).  The result was that the sentencing commission expanded the offense conduct that qualified for the higher base offense level and narrowed the offense conduct that qualified for the lower base offense level.  The exception in the outdated version of the guideline singled out offenses involving "sophisticated weaponry" for harsher punishment, but the current exception serves the completely different purpose of punishing offenses less harshly when they involve "only" "non-fully automatic small arms" like "rifles, handguns, or shotguns."

Textually, the sentencing commission scrapped the "sophisticated weaponry" language.  *See id.* § 2M5.2(a)(1) (1990).  After 1990, the commission rewrote the language so that the attempted exportation of *all* arms, munitions, and military equipment— whether they were "sophisticated weaponry" or not—fell within the higher base offense level, and the commission carved out a

20-11035 LUCK, J., Concurring in part and in the judgment        8

narrow exception for "only" "non-fully automatic small arms (rifles, handguns, or shotguns)." *Id.* § 2M5.2(a)(2). The term "weapons" in the post-1990 narrow exception had no connection to the "sophisticated weaponry" of the outdated version. Instead, "weapons" referred to "only" "non-fully automatic small arms" like "rifles, handguns, or shotguns"—the language the commission used in the new version of section 2M5.2(a)(2). *See Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1348 (11th Cir. 2021) ("The context and content of the surrounding words matter in how we understand words and phrases."). The 1990 amendment completely changed the guideline.

Take *Chung* as an example. There, we concluded that a cathode assembly, which was a part in a missile guidance system, fell within the outdated exception for "sophisticated weaponry." *Chung*, 931 F.2d at 46. But, today, the same cathode assembly would not fall within the new narrow exception because it is not "only" a "non-fully automatic small arm[]" like a "rifle[], handgun[], or shotgun[]." U.S.S.G. § 2M5.2(a)(2).

The cases interpreting the outdated version of section 2M5.2 (*Chung*, *Tsai*, and *Nissen*) are unhelpful because they do not grapple with the new text—or context—of the narrow exception. They do not analyze, as we must, whether the exported munition parts are "only" "non-fully automatic small arms" like "rifles, handguns, or shotguns." U.S.S.G. § 2M5.2(a)(2). Because the gun parts that Stines attempted to export without a license were not "only" "small arms" like "rifles, handguns, or shotguns," the post-1990

20-11035 Luck, J., Concurring in part and in the judgment        9

section 2M5.2(a)(2)(A) narrow exception doesn't apply to his of-
fense conduct.  So the default base offense level does.

Finally, Stines argues that, despite the guideline's plain lan-
guage, reading "arms" as excluding gun parts would lead to an ab-
surd result that the sentencing commission couldn't have intended.
*See Small v. United States*, 544 U.S. 385, 404 (2005) (Thomas, J.,
dissenting) (explaining that the "canon against absurdities" should
be employed "where the result of applying the plain language
would be, in a genuine sense, absurd, *i.e.,* where it is quite impos-
sible that Congress could have intended the result and where the
alleged absurdity is so clear as to be obvious to most anyone" (quo-
tation and ellipsis omitted)).  If he had attempted to transport two
assembled AR-15s and nothing else, Stines argues, the narrow ex-
ception would have applied to give him a base offense level of four-
teen, but if he had broken those two AR-15s down into their con-
stituent parts to transport, the higher default base offense level of
twenty-six would have applied.

This result is not absurd.  The sentencing commission, in
2011, amended section 2M5.2(a)(2)(A) to reduce, from ten to two,
the amount of "non-fully automatic small arms" carved out from
the default base offense level.  The commission narrowed the ex-
ception because, it determined, "export offenses involving more
than two firearms are more serious and more likely to involve traf-
ficking."  U.S.S.G. App. C, Amend. 753 (Reason for Amendment).
The commission intended greater punishment (through a higher

20-11035 LUCK, J., Concurring in part and in the judgment      10

base offense level) for offense conduct more likely to involve trafficking.

If Stines had tried to ship two AR-15 rifles from the United States to Haiti, it would be less likely that the shipment was meant to traffic the firearms. But, if those two rifles were disassembled into twenty parts and he tried to ship those twenty parts, the attempted shipment of twenty gun parts would have involved more than two firearms and thus would have been more serious and more likely to involve trafficking. This is because each part is a component of one AR-15 rifle, so the twenty parts are components of as many as twenty AR-15 rifles. And that amount of rifles, as the sentencing commission explained, is much more likely to involve trafficking in firearms.

Shipping gun parts instead of whole guns is also more likely to involve trafficking in firearms because a trafficker is more likely to ship small parts to avoid detection. A trafficker can tuck a rifle pin away in a little suitcase compartment better than he can conceal a whole rifle. But if he shipped two guns, that shipment would have involved only two hard-to-miss guns.

Stines shipped twenty-three easier-to-conceal gun parts. Necessary parts that can service up to twenty-three guns are more dangerous and worthier of the higher default base offense level than two guns are.

20-11035 LUCK, J., Concurring in part and in the judgment        11

Because gun parts are not "non-fully automatic small arms," and applying the default base offense level is not absurd, I agree with the majority opinion that we should affirm Stines's sentence.

LAGOA, Circuit Judge, concurring:

I concur in full with the majority's opinion. I write separately to explain why I disagree with Judge Luck's opinion concurring in part.

That opinion disagrees with the majority opinion's interpretation of U.S.S.G. § 2M5.2(a)(2): that component parts of a non-fully automatic small arm are weapons. Looking at the definition of the term "arms," the concurrence in part suggests that the relevant AR-15 parts are not themselves "arms" that can be taken into combat or war. Luck, J., Concur. Op. at 2–3. But an AR-15 is an end-item that is the sum of its component parts. And the parts Stines attempted to export are "(items of) military equipment," as designated by the United States Munitions List, even though the parts are not, themselves, the end-item. *Arms, Oxford English Dictionary* (3d ed.) (defining the term "arms" as "[w]eapons of war or combat; (items of) military equipment, both offensive and defensive; munitions"); *see* 22 C.F.R. § 121.1(a)(1) (the United States Munitions List categories "usually start by enumerating or otherwise describing end-items, followed by major systems and equipment; parts, components, accessories, and attachments"). Indeed, the Munitions List—which is referenced in § 2M5.2, Application Note 1—categorizes both firearms and component parts of firearms and guns and components parts of guns, as single categories of defense articles. *See* 22 C.F.R. § 121.1 ("Category I Firearms and Related Articles" and "Category II Guns and Armament").

The concurrence in part also suggests that exporting component parts of non-fully automatic small arms does not involve only "non-fully automatic small arms." Luck, J. Concur. at 3–4. In support, the opinion cites cases which held that, under a prior version of § 2M5.2(a)(2), exporting ammunition in addition to non-fully automatic firearms was not an offense that involved only non-fully automatic weapons. *Id.* at 4–7 (citing *United States v. Muthana*, 60 F.3d 1217 (7th Cir. 1995) and *United States v. Diaz-Gomez*, 680 F.3d 477 (5th Cir. 2012)). But unlike firearm parts or gun parts, which together with their end-items form a single category of defense articles, ammunition is its own separate category of defense articles under the U.S. Munitions List. *See* 22 C.F.R. § 121.1 ("Category III Ammunition and Ordinance"). And the parties do not dispute that the relevant parts are components only for "non-fully automatic small arms."

Finally, a note about the "canon against absurdities." Both the majority and the concurrence in part reject Stines's resort to that canon. And rightfully so, because, as noted in the concurrence in part, proper application of that canon is limited to a truly exceptional case. *See Small v. United States*, 544 U.S. 385, 404 (2005) (Thomas, J., dissenting) (the canon against absurdities "should [be] employ[ed] only . . . where it is quite impossible that Congress could have intended the result . . . and where the alleged absurdity is so clear as to be obvious to most anyone" (quotation omitted)). Neither the majority's nor the concurrence in part's read of

20-11035                LAGOA, J., Concurring                3

section 2M5.2(a)(2) comes anywhere close to implicating that canon of construction.

Based on the Guideline's text, including its references to the United States Munitions List, and our decision in *United States v. Fu Chin Chung*, 931 F.2d 43, 46 (11th Cir. 1991), I agree with the majority opinion's interpretation of § 2M5.2(a)(2).